# UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

### Docket No. 22-cr-10157--FDS

_____

**UNITED STATES OF AMERICA**      )

)

**v.**      )

)

**KOBE SMITH**      )

_____

## <u>MOTION TO DISMISS</u>

## <u>INTRODUCTION</u>

> **"**A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, ***shall NOT be infringed.***"

U.S. Const. Amend II (ratified on December 15, 1791) (emphasis added).

> "In declaring what shall be the supreme law of the land, the constitution itself is first mentioned; and not the laws of the United States generally. . . that a law repugnant to the constitution is void; and the courts, as well as other departments, are bound by that instrument."

*Marbury v. Madison,* 1 Cranch 137 (1803).

> "[W]hen the Second Amendment's plain text **<u>covers</u>** an individual's conduct, The Constitution presumptively protects that conduct."

*N.Y. State Rifle & Pistol Assoc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022) (emphasis added)

From review of the above, we see that over 200 years have elapsed regarding the enactment of the 2nd Amendment, and there is litigation still addressing the *scope* of what the original intention meant.  The main lesson we can draw from these temporal book-ends is that a very core concept has not been altered – the right to bear arms is "fundamental".  *Mcdonald v. City of Chicago*, 130 S. Ct. 3020, 3042 (2010).  With such a fundamental right at work, a lone defendant (and a non-felon) in Massachusetts asks whether his right to bear arms are infringed by prohibiting

him from calling up a friend in Alabama and asking to purchase one or even two of his guns.  Or, and perhaps even more commonly contemplated, the same person walking into a gun store in Alabama to purchase one to bring back home. 18 U.S.C. §§ 922(a)(2) and (3) seems to think it can prohibit both scenarios.[1]  To be sure, this non-felon could very easily "purchas[e] a firearm in [his] home state, which is presumptively the most convenient place to buy anything." *United States v. Decastro*, 682 F. 3d 160, 179 (2nd Cir. 2012).   Neither would this non-felon be barred from "purchases from an out-of-state supplier if the gun is first transferred to a licensed dealer in the purchaser's home state". *Id.*  So the question is begged, since both 922(a)(2) and (3) leave open a person's right to bear arms as described above, do we overlook the constitutional imposition upon which the statute does in fact trigger?  Our Supreme Court may believe that such an imposition cannot be overlooked.  *See Democratic Party v. Jones*, 530 U.S. 560 (2000) (In terms of the 1st Amendment, an unconstitutional restriction upon protected activity will not be overlooked simply because it leaves other protected activity unimpaired).

If from reviewing *Jones*, we come to understand that our Supreme Court has frowned upon ignoring constitutional infringements if other ways are left open for citizens to enjoy their rights, can we therefore dismiss any infringement upon 2nd Amendment freedoms due to a belief that the nuisance suffered by the citizen is trivial, or in other words because it's effect upon the citizen is "*de minimis*".  *Crooker v. Sexton Motors*, 469 F 2d 206 (1st Cir. 1972) (Stating the *de minimis* rule is where the harm is so indirect and casual as to be called trivial).   Maybe not, because "if a law 'impinges upon a fundamental right explicitly or ***implicity*** secured by the Constitution [it] is presumptively unconstitutional". . . *Harris v. McRae,* 448 U.S. 297, 312 (1980).

---

[1] Section 922(a)(2) provides that is unlawful "for any importer, manufacturer, dealer, or collector licensed under the provisions of this chapter to ship or transport in interstate commerce any firearm to any person other than a licensed importer, manufacturer, dealer, or collector.  Section 922(a)(3) renders it unlawful "for any person, other than a licensed importer, manufacturer, dealer, or collector to transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State".

COMES NOW THE Defendant, Kobe Smith ("Smith"), and moves to dismiss the indictment (ECF No. 3) against him on the grounds that § 922(a)(3) and (2) are unconstitutional: a) on facially overbroad grounds, as they infringe upon his 2nd Amendment rights by banning ALL law-abiding citizens from going to neighboring states to purchase firearms; and b) as applied to him – as he is a non-felon (or a law-abiding citizen himself), but is also "overtly" alleged in his indictment with trying to do the same – receiving a gun from a neighboring state – a crime under § 922(a)(3).[2]  In specific, Smith is *overtly* alleged to have requested a firearm (or two) from an alleged co-conspirator in Alabama. *ECF no. 3 at page 5*, ¶f.  However, Smith contends that said conduct – ordering a gun for his own self-protection – is a core right protected by the 2nd Amendment. *See Bruen*, *supra*.

Now, if this Court believes that self-defense was not Smith's purpose, then a trial may be necessary to figure that out.  But for now, Smith merely challenges the original and *facial* point – does the 2nd Amendment protect any and all law-abiding citizens in their receiving of a gun across state lines for self-defense?  Again, the challenged regulation believes no such protection exists. As a result, Smith claims that this broad-sweeping regulation cannot function outside the 2nd Amendment's core protections.  Before coming to this conclusion however, we can NOT consider whether the law promotes an important governmental interest.  *Id.  See also S. Rep. No. 90-1097*, at 49 (1968) (18 U.S.C. §§ 922(a)(3) and (2) enacted as "a means to afford[] circumvention of State and local laws governing the acquisition of [firearms]").  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  *Bruen* at 2130.

---

[2] On Smith's applied challenge as to him, he only challenges the constitutionality of 922(a)(3), as his conduct, as expounded *infra*, would only be implicated under that statute.   There is no allegation that Mr. Smith was violating 922(a)(2) in the capacity of some licensed entity, or conspired with others to do the same.  He therefore asks the court to dismiss that count for lack of evidence alleged in the indictment.

Smith's motion therefore seeks a ruling which simply addresses the regulation in context with our Nation's history and traditions, and which also recognizes that, and "[i]n the wake of *Bruen,* [the notion of] assessing a gun restriction by balancing a government's interest (safety of citizens) with the burden imposed on an individual's right to bear arms is out". *Range v. Attorney Gen,* 69 F. 4th 96, 111 (2023). With this in mind, non-felons (like Smith) who attempt to enjoy their right of self-defense should be able to trump governmental legislation which provides barriers to that right. *See Bruen generally* (legislation which provided a barrier for New York residents to publically carry a weapon outside the home deemed unconstitutional, even though the barrier did not: a) stop public carry altogether – only first requiring special need; or b) stop alternative means of bearing arms – namely within the home).

In sum, and before proceeding to argument, Smith's request simply asks this Court for the following opinions: 1) whether the plain text of the 2nd Amendment **covers** the conduct of a non-felon who seeks to obtain a firearm over state lines for self-defense; 2) if this Court after a "text and history" exploration finds that his conduct is so covered, would the *de minimus* doctrine have any application within the analysis; and 3) whether the challenged statute – banning citizens from transporting and/or receiving a weapon from another state – is consistent with and/or "relevantly similar" to a law from a period of history that sheds light on the 2nd Amendment's meaning.

## ARGUMENT

## I.

## THE SECOND AMENDMENT'S PLAIN TEXT COVERS THE CONDUCT ALLEGED AGAINST MR. SMITH – THE RECEIPT OF A FIREARM OUTSIDE HIS HOME STATE

### A. Mr. Smith's conduct

In the indictment it is alleged that Smith conspired (under 18 U.S.C. § 371) with 3 other individuals to violate 18 U.S.C § 922 (a)(2) and (3). One of the co-conspirators was Mr. Brandon

4

MOORE, a resident of Alabama, but who was NOT a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18 of the United States Code. *Id. at pages 1-2.* The overt acts or "conduct" alleged by the indictment to support Smith's role in this conspiracy are alleged as follows:

- On or around February 24, 2020, after MOORE had returned to Alabama, SMITH sent a message to MOORE asking him to obtain one or two firearms for him.

- On or around July 30, 2020, MOORE sent SMITH a message offering to sell him a firearm with a magazine in it.

- Around April 24, 2021, SMITH sent MOORE messages saying "call my number. . ."

*Id. at pages 5-7.* To be sure, that is the sum and substance of ALL of Mr. Smith's "conduct" (or at least as overtly alleged) in support of the charge within the indictment.[3]

---

[3] Smith does not mean to be short on substance when stating the number of allegations upon which indictment claims against him in full. For pages 1-4 lodge an abundance of claims that Smith conspired with others to bring 24 guns from Alabama to Massachusetts to, *inter alia*, distribute these weapons to their associates. It is also true that this Court (on a motion to dismiss) must accept the allegations in the indictment as true. *United States v. Dunbar*, 367 F. Supp. 2d 59, 60 (D. Mass. 2005). However, these surplus and/or successive crimes of distribution have nothing to do with the charges upon which Smith is alleged to have offended – conspiring to violate 922(a)(2) and (3). For Smith's first alleged crime is attempting (or conspiring with others) to purchase a firearm out of state in violation of **922(a)(3)**. Thereafter comes a subsequent crime of distribution of guns in violation of **922(a)(1)(A)** – but a crime for which Smith is not charged. In other words, and even accepting as true the government's claim about Smith's intentions/actions once he or his alleged co-conspirators received weapons, those alleged **after-the-fact** intentions/actions have no relevance on whether 922(a)(3) was violated **before-the-fact**. As applied to him, Smith only seeks to dismiss the charge which relies upon *conduct* that is protected under the 2nd Amendment – attempting to possess a firearm out of state. If this Court desires to not only consider this conduct but also his alleged thought process for doing so, or any conduct reflecting what was done after any receipt of weapons, and then factor the same into denying his motion to dismiss, then Smith would be looking to **exclude** at trial any such *after the fact* intentions or behavior after the crime of 922(a)(3) was consummated.

Further, and if Smith's (or his alleged co-conspirators') intentions, or his behavior "post-crime", appears front and center at his trial, Smith would also be seeking a jury instruction explaining that he has a lawful 2nd Amendment right to bear arms for self-defense, and since that is protected conduct, the government must prove beyond a reasonable doubt that Smith had some illicit purpose to commit the crime *other* than self-defense. If this Court deems Smith's purpose relevant, and thereafter the government can prove that Smith attempted to violate section 922 to distribute guns to his friends, then of course that is not protected conduct, and so he must face the music with that result. However, and if the government does not prove any such illicit purpose, then Smith should not be convicted for violating any statute for exercising legitimate conduct which gives him constitutional protection. The reason being is that our constitution, and of course with it being the "supreme law of the land", trumps any inferior legislation. *See Marbury v. Madison*, 1 Cranch 137 (1803). Ultimately, Smith can see where his Motion to Dismiss may ultimately end up, so he will be preparing subsequent motions *in limine* which would follow any denial. But first, Smith asks for the constitutional question to be answered, for he cannot know his rights without it.

While the overt acts listed above were against Mr. Smith, there were others made against his co-conspirators: 1) On August 6, 2020 bus tickets were purchased for Mr. Jamori BROWN and Mr. Jahquel PRINGLE to travel from Boston, Massachusetts to Montgomery, Alabama; and 2) on August 17, 2020, both alleged co-conspirators traveled from Alabama back to Boston with approximately 12 to 15 firearms that MOORE had given them in Alabama. *See ECF no. 3 at pages 6-7*. It has never been alleged that Smith assisted these folks in their cross-country mission, let alone (except by conclusory allegation) that Smith knew or agreed that their business was his. *Id. at pages 2-4*.

Moreover, and as far as Smith's part in all of this is concerned, it is further NOT alleged in any of Smith's overt acts, that he ***shared/agreed*** with the alleged intentions of his co-conspirators that any gun would be re-distributed to others. In fact, all the evidence which has been presented within discovery demonstrates that Smith wanted his gun for self-defense purposes.[4] In any event, and whatever Smith's reasons were for wanting a weapon, those reasons are not elements of the offense of 18 U.S.C § 922 (a)(3).[5] With these elements in mind, Smith simply seeks to spar with the government on what "conduct" of his (or other non-felons like him) violates 922(a)(3), and whether that conduct is constitutionally protected. Smith's conduct here is "overtly" plain. He sought to transport and/or receive in Massachusetts 1 or 2 firearms from MOORE in Alabama – an unlicensed

---

[4] The discovery given on Smith's intentions is light, but on his co-conspirators is weighty. As the government does not have to prove their case at this stage, Smith wont quarrel now about whether the government can prove that Smith's own mind was in accord with his alleged co-conspirators. He just wants to make it known that the government has no ***overt*** evidence of what his intentions were, beyond what he was provided via one page of discovery - a text thread between him and MOORE extracted from one day out of the alleged conspiracy. He claims in the thread and quote: "Need sumn, just know nese got chased and I'm on that. Lmk bro I need a good enough deal on 2 and I'll grab it Or 1". At trial, the jury will hear NO more about what was in the mind of Mr. Kobe Smith regarding why he reached out to Mr. MOORE at this isolated moment. It just reads as articulated in Smith's opening remarks of this brief – calling a friend in Alabama to purchase one or two of his guns. Smith also claims that "nese" is a family member whom she and him needed protection from. Never once was there any mention about him getting guns for gang members, or any language that a weapon was needed *other than* for protection of himself or others.

[5] The elements are only 2: First, the defendant was not a licensed as a firearms[dealer][importer][manufacturer] [collector]; and Second, the defendant willfully [transported into][received in] the state which the defendant resided a firearm that the defendant purchased or otherwise obtained outside that state". *See Model Jury Instructions for the Ninth Circuit, 2022 ed.*

dealer. He makes no quarrel that said conduct violates 922(a)(3) as it is presently conceived. The question for today is whether that conduct is *covered* and thus protected under the 2nd Amendment.

**B. Where the scope of the 2nd Amendment covers the right to bear arms, if 922(a)(3) regulates Smith's bearing of arms, it therefore must be within the scope of 2nd Amendment protections; Smith cannot see how it can be looked at any other way.**

**i.    Introduction**

In *Bruen,* Justice Thomas speaks about the "popular" two-part test which Courts of Appeals have adopted to assess  legislation which regulates a citizen's right to bear arms: 1) ascertaining  the original scope of the Second Amendment based on its' historical meaning, and as originally understood.  *Bruen* at 2126 citing *United States v. Focia*, 869 F. 3d 1269, 1285 (11th Cir. 2017); and 2) "[i]f a 'core Second Amendment right is burdened, courts apply 'strict scrutiny' and ask whether the Government can prove that the law is 'narrowly tailored to achieve a compelling governmental interest'".  *Kolbe v. Hogan*, 849 F. 3d 114, 133 (4th Cir. 2017) (internal quotation marks omitted). "Otherwise, they apply immediate scrutiny and consider whether the Government can show that the regulation is 'substantially related to the achievement of an important governmental interest'". *Bruen* at 2126-27.  It should be noticed that our own Circuit has also adopted this approach in 2018.  *See e.g., Gould v. Morgan*, 907 F. 3d 659, 669 (2018) ("Although we have not yet explicitly adopted this two-step approach, we do so today").

**ii.    The first step requires going back in time to the Amendment's ratification.**

Focusing on just the first step for a moment, this Circuit calls for an inquiry on whether the "regulated conduct 'was understood to be within the scope at the time of ratification'". *Gould* at 669 citing *United States v. Chester*, 628 F. 3d 673, 680 (4th Cir. 2010).  How one understands the true breadth of the scope is via a "backward-looking inquiry".  *Id.*  In other words, such an inquiry must show that the challenged regulation is consistent with Amendment's scope as it was "understood to

have when the people adopted [it]." *District of Columbia v. Heller,* 128 S. Ct. 2783, 2821 (2008) ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope is too broad"). The birth year of when our people adopted the 2nd Amendment is 1791. *Bruen* at 2119.

### iii. Time traveling back to 1791 provides no conclusion *other than* the bearing of arms would "cover" the transportation and/or receipt of a gun over state lines.

The holdings in *Gould* and *Heller* above trigger one simple argument from Mr. Smith. If, and by invoking *Gould's* first directive of time-travel, if 922(a)(3) were hypothetically codified in 1791 – rendering it a crime to receive a firearm over state lines for the purposes of self-defense, would the 2nd Amendment have pushed back to cover this conduct? Not only that, would it have also and ultimately tolerated this legislation? Not only does Smith strain to see any answer other than "yes" to coverage, and "no" to toleration, but Smith is also unaware of any case in existence to support why from a historical perspective the answers would be any different. *See ARGUMENT III, infra.*

Smith believes this to be the case, and because: "[t]he most natural reading of [the Second Amendment] encompasses public carry". *Peruta v. California,* 137 S. Ct. 1995, 1998 (2017) (THOMAS, J., dissenting from denial of certiorari). Justice Thomas (and now author of *Bruen*) also held, that "it is extremely improbable that the Framers understood the Second Amendment to protect little more than carrying a gun from the bedroom to the kitchen". *Id.* Justice Thomas finally held, "it would take serious linguistic gymnastics – and a repudiation of this Court's decision in *Heller* – to claim that the phrase 'bear Arms' does not extend the Second Amendment beyond the home". *Rogers v. Grewal*, 140 S. Ct. 1865, 1869 (2020) (THOMAS J., dissenting from denial of certiorari).[6]

---

[6] These holdings derive from Justice Thomas' analysis of the 2nd Amendment's reach, and with a starting point back to our country's English roots, and he goes back – way back- all the way to 1328. *Grewal,* 140 S. Ct. 1865, 1869 (2020). What is noteworthy is that Justice Thomas received the opportunity to write for the Court in 2022 in *Bruen* and never once in his prong 1 (text and history) analysis did he make any reference (in addition to a backward-looking inquiry) to also reviewing the challenged regulation for its level of present day burden or impact on 2nd Amendment rights.

As a result of the above, Smith perceives Justice Thomas' *pre-Bruen* decision in *Grewal* as not drawing boundaries of the 2nd Amendment's scope in terms of spatial limitations. Now, and since 2022, with the appearance of Justice Thomas' opinion in *Bruen*, Smith sees no present-day conflict with his opinion in *Grewal* – drafted some 2 years earlier. If this Court therefore agrees that *Bruen* and *Grewal* are in-sync, the next question is now begged: if the right to bear arms extends the ***scope*** of the 2nd Amendment beyond the home, why would that ***scope*** simply stop (in its' tracks) at some state line? To bring the argument home, if we accept that our 2nd Amendment freedoms extend - let's say from the starting point of this courthouse in Boston - and we continue due South some 50 miles (give or take) to the border of Rhode Island, then once a person steps an inch over that border, would our freedoms break stride from our gait, and be left standing and staring at us from an inch behind? How would the Second Amendment's 1791 enshrinement of the right to bear arms feel about that?

All of the rhetoric aside, Smith sees no way that such a stark termination of rights was endorsed by *Bruen*, and also sees no such matching endorsement in *Grewal*. Ultimately, Mr. Smith just can't reconcile how the Second Amendment operates at full strength in one small section of this country (Massachusetts) and then loses its vigor and girth after crossing over some invented line – drawn simply to partition land between it and the rest of our country. *See e.g., Mitchel and Others v. The United States,* 34 U.S. 711 (1835) (Dispute regarding grants of land from Indian nation on different sides of a state border not held as such, where all that existed was an "imaginary line", between the land, and both sides of the land had to be approved by the "King" of England). Smith uses this case as a metaphor to argue that the Constitution is "King" here – and its power should not terminate at an imaginary line such as a state border. Consider the following hypothetical: if each State were considered to be 2% of this country (with the sum of 50 states being 100 %), then by

operation, 18 U.S.C. § 922(a)(3) would terminate constitutional protection (from the conduct prohibited) in the other 98 percent of this Country.  If the word "terminate" is too strong, at the very least, the statute would *limit* the bearing of arms within this 98 percent.  This peculiar loss appears in stark conflict with the operative breadth of this freedom which is (and without dispute) "beyond the home". *Grewal* at 1869.[7]

In fact, Smith also doubles down on the above argument by re-presenting a parallel argument already advanced by Smith's alleged co-conspirator - Mr. Jahquel Pringle.  On August 15, 2023, Mr. Pringle filed a motion to dismiss the same statutes which have also befallen Mr. Smith (ECF no. 102).  To save time and space here, Smith hereby incorporates and relies upon the same arguments made by Pringle in his Motion to Dismiss.  But to nut-shell it, and so as to avoid any claimed waiver of the same, Smith sides with the notion that statutes which criminalize the *receipt* of firearms inherently criminalize *possession* of them, where "receipt is the condition precedent to keeping and bearing arms".  *See United States v. Stambaugh*, no. CR 22-00218-PRW-2, 2022 WL 16936043 at *3 (W.D. Oklahoma Nov. 14, 2022).   Smith therefore believes and argues, in essence, that if the 1791 installation of the 2nd Amendment's plain text would cover the *possession* of a firearm, he cannot see how *receipt* or *transportation* has a different perspective.

**C.  If the scope of the 2nd Amendment covers conduct regulated by 922(a) (3), does the analysis then move to *Bruen* stage 2, or, does the prong 1 analysis stay in neutral, still requiring more work, to first assess the degree of impact upon 2nd Amendment rights? Smith believes such an approach conflicts with the methodology promulgated in *Bruen*.**

---

[7] Of course, each state can legislate as they will, and may have their own laws about traveling "beyond the home", and particularly into their respective state – be it to purchase a weapon, or just traveling through, but also armed with one before arriving home.  But the topic of the day is whether the federal government can deny the right to bear arms "beyond the home" – which of course Justice Thomas says "no".   But then can a national Congress invent its' own limits to the broad parameters given by Justice Thomas – by adding the word "state" to Justice Thomas' edict: "beyond their home***state***".  For it appears that 922(a)(3) does exactly that by excluding the bearing of arms via a vast restriction which separates one state from 49 others – and all being done within the UNITED States of America.  Mr. Smith's new rhetoric now takes on the complexion of some patriotic zealot, but he is just trying to compellingly advocate the optics as presented.  He understands that legislation like 922(a)(3) is upon us for a safer America. But until this Country is completely safe, law-abiding citizens should have the right to leave their home state for a weapon purchase to defend him or herself against the unsafe conditions as we presently know it.

When Mr. Pringle took his shot before this Court in arguing *Stambaugh* along with his accompanying arguments, this Court blocked the goal, rejecting Pringle's arguments as being "unpersuasive". *Pringle* at *6. However, Smith points out that the Court's doubt did not emerge after it reviewed the language of 922(a) (3), and then took a trip back in time to 1791, to determine if the regulation runs inconsistent with the purview of 2nd Amendment protections. Rather, this Court simply concluded that the conduct regulated by § 922(a)(3) doesn't trigger *Bruen* scrutiny because the legislation only burdens the right to bear arms to a "*de-minimis*" degree. *Id.* at *7. It is this holding upon which Smith begins his next argument, where he hopes to have this Court reconsider the holding.

His argument once again advances in a nut-shell the view that so long as a citizen's conduct of receiving a firearm out of state is perceived to be within the scope of the 2nd Amendment at the time of its' ratification, the analysis moves onward to stage two of *Bruen*. Appreciating this Supreme directive, the analysis in *Pringle* appears at odds with the *modus operandi* engaged in *Bruen*. For *Bruen* makes no mention of stopping the bus which was traveling back to 1791, in order to first assess any impact upon 2nd Amendment freedoms. But yet the analysis in *Pringle* was engaged (and most respectfully) by way of putting this bus in neutral – stopping the *Bruen* analysis in its' tracks – to deliberate and thereafter find that any burden upon Pringle's rights to be *de minimis*. *Id.* at *7. To do so however must (by inference) first acknowledge that the 2nd Amendment covers the conduct, albeit believing so in a trivial way. But if this Court agrees that receiving a firearm over state lines does garner *some* coverage or regulation over one's right to bear arms, then all Smith asks is to proceed to stage 2 of *Bruen*.

This is where Mr. Smith's brief climaxes in his argument – which is to follow shortly. Smith argues that a *de minimis* outcome on the exercise of 2nd Amendment rights has no applicability when

11

determining whether the conduct regulated by 922(a)(3) falls within the Amendment's scope.   The only application to administer is to determine whether the conduct is covered, and if so, it receives presumptive protection under the Second Amendment. The alternative application appears to assess how injurious a citizen is wounded if he doesn't get the benefit of that presumptive protection.   In other words, this latter application doesn't compare the conduct with the 2nd Amendment's plain text as required, but rather considers the *cost* suffered by the citizen as an *effect* of the legislation.   This latter application is no longer at work.   For *Bruen* has explicitly rejected the notion of judges subjectively assessing the cost or effect of the burden suffered by the citizen, so that one can balance that burden against the government's interest in stage 2 of the analysis.   *Argued supra.*   It would appear that, and most respectfully again, the Court's approach in *Pringle* would stand in conflict with the methodology demanded in *Bruen.*

## II

**SO LONG AS ONE'S CONDUCT IS COVERED UNDER THE 2ND AMENDMENT'S PLAIN TEXT, STAGE TWO BECOMES THE NEXT-STOP; THE *BRUEN* SCHEME DOES NOT SPEAK TO ANY DELAYS IN THE VOYAGE BY FIRST INSTRUCTING COURTS TO ASSESS THE DEGREE OF A CITIZEN'S BURDEN IMPOSED BY THE LEGISLATION; IN FACT BRUEN HAS EXPLICTLY REJECTED SUCH ASSESSMENTS OF A CITIZEN'S BURDEN IN STAGE 2 OF THE ANALYSIS**

### A.  Introduction

Taking one last look at the methodology espoused in *Bruen,* the process could not be more succinctly stated – Courts are required "to **assess** whether modern firearm regulations are consistent with the Second Amendment's text and historical understanding".  *Bruen* at 2118 (emphasis added). To be sure,  *Bruen*'s two-part analysis only has a stop-gap if the conduct falls beyond the Amendment's **original** scope.  *Id.* at 2126.  ("If the government can prove that the regulated conduct falls beyond the Amendment's original scope, 'then the analysis can stop there;'"). With this procedural map in place, this Court may believe that stoppage can still occur, and before even stage 1

is engaged – with the result being a bypass of the comparison between the conduct and the Amendment's text and history.  Most respectfully, we see this bear out in *Pringle,* where this Court stopped from engagement of the comparison, because it ultimately opined: "in short, Sections 922(a)(3) and (2) do not burden an individual's Second Amendment "right to keep and bear arms for self-defense."  *Id. at* *8 citing *Bruen* 142 S. Ct. at 2126.   But this assessment question is a different one than the one espoused in *Bruen* – requiring time travel to assess if the conduct prohibited in 922(a)(3) "was understood to be within the scope of the right at the time of ratification".  *Gould* at 669 (citation omitted).

**B.  The *Pringle* decision explains why 922(a)(3) doesn't burden the right to bear arms.**

A further reading into the *Pringle* decision however does provide clarification on the holding this Court advanced.  Although this Court held that challenged regulations do not burden 2nd Amendment rights, it qualified that holding by explaining that any perceived burden against Mr. Pringle (and by extrapolation Mr. Smith) would be *de minimis*, and thus does not trigger constitutional protection, and thereby bypassing the *Bruen* exploration in its' totality. *Pringle* at *7 citing *Mance v. Sessions*,  896 F. 3d 699, 709 (5th Cir. 2018) (Such a "de minimis burden on downstream possession rights" fails to "trigger *Bruen* scrutiny.").  However, Smith believes he can rebut this holding in two ways:  **First**, just because a right is not significantly burdened does not also mean it automatically falls outside the scope of any protection afforded by the bill of rights. *See e.g., Libertarian Party of Washington v. Munro*, 31 F. 3d 759, 763 (9th Cir 1994) (law posing a *de minimis* burden on First Amendment Rights still triggers constitutional review to determine if the law is rationally related to a legitimate state interest); *See also West Side Women's Services* v. *City of Cleveland*, 573 F. Supp. 504, 517 (ND Ohio 1983) (*de minimis* burdens on the abortion decision triggers rational relationship test);

**Secondly**, *Pringle's de minimis* assessment comes from its' conclusion that 922(a) (3) still leaves other ways to bear arms. *Pringle* at *7, citing *United States v. Lucha El Libertad*, No. 22-cr-644, 2023 WL 4378863 at *13 (S.D.N.Y. July 3, 2023) (922(a)(3) does not on its face operate to prevent anyone from keeping or bearing arms; it merely prescribes particular modes of acquiring guns). However, Mr. Smith takes issue with the approach a well. *See Democratic Party v. Jones*, 530 U.S. 560 (2000) (Supreme Court stating (in terms of the First Amendment) that they will not overlook an unconstitutional restriction upon protected activity simply because it leaves other protected activity unimpaired). Mr. Smith believes that a regulation which leaves open other avenues to enjoy his 2nd Amendment rights speaks nothing to whether the challenged avenue has its' own independent protection under that same Amendment – which simply requires that it is consistent with its' plain text and historical understanding. What is even more undeniable is that *Bruen* has specifically rejected Courts from attempting to assess the extent a regulation impacts life upon present-day citizens, at least in the stage 2 analysis of the decision.

**C.** ***Bruen* specifically rejects judicial assessments of the severity of a statute's burden upon 2nd Amendment rights in stage 2 of the analysis.**

Once a constitutional inquiry extends into stage 2 of *Bruen*, our Courts of Appeal often analyze "how close the law comes to the core of the Second Amendment right and [thereafter] the **severity of the law's burden** on that right." *Id* at 2126. (internal quotation marks and citations omitted) (emphasis added). Pursuant to that ultimate goal, if a "core" Second Amendment right is burdened, courts apply "strict scrutiny" and ask whether the Government can prove that the law is "narrowly tailored to achieve a compelling governmental interest." *Id.* Otherwise, they apply intermediate scrutiny and consider whether the Government can show that the regulation is "substantially related to the achievement of an important governmental interest." *Id.* at 2127. However, this second step in evaluating 2nd Amendment constitutional rights has been considered

as a "one-step too many" and is no longer for our Circuits to engage. *Bruen* at 2117-18. With this banished step, and by inference, we must also banish any judicial assessment of the "severity of the burden [upon a defendant's right to bear arms]". *Id.* at 2126. What actually replaces this 2nd prong is an alternative one – finding the "consistency" of the challenged regulation with "relevantly similar" law from a period of history that sheds light on the 2nd Amendment's meaning.[8]

To be sure, this changing of the guard on stage 2 of the analysis was not something created in 2022, and out of thin air by our Supreme Court, and once *Bruen* came to pass. For *Heller* and *McDonald* both expressly reject the application of any "judge-empowering 'interest-balancing inquiry' that asks whether the statute burdens a protected interest in a way or to an ***extent*** that is out of proportion to the statute's effects upon other important governmental interest.'" *Heller*, 554 U.S. at 634, 128 S. Ct. 2783 (emphasis added); *see also McDonald*, 561 U.S. at 790-791 (plurality opinion) (the Second Amendment does not permit – let alone require – "judges to assess the **costs and benefits** of firearms restrictions" under means-end scrutiny) (emphasis added).

All of this above is to say below that the assessing of a citizen's burden, or measuring to what "cost" or to what "extent" of how deeply a regulation cuts into the right to bear arms is no longer a consideration for the Court in Stage 2 of *Bruen*. As a result, and if our Supreme Court explicitly excluded such judicial assessments with Stage 2, it would appear *inconsistent* to bring this assessment back to life as a mechanism to avoid the *Bruen* analysis altogether. Now, Mr. Smith is not turning a blind-eye to how other circuits have felt – say for example the 2nd Circuit in

---

[8] *Id.* at 2131-2132. To be sure, the evaluation done at this replaced 2nd stage only makes comparisons between the *then* and the *now*. The contrast simply considers whether "modern and historical regulations impose comparable burdens on the right of armed self-defense". *Bruen* at 2132. Smith cannot conceive that in 1791, a law denying the right to travel out of state to receive a weapon and then transport it home would be constitutionally upheld, and simply because of its *de minimis* effect – leaving open ways to still get a weapon at the next farm over, or to have it shipped to the farm from across country by stagecoach. If citizens back then could bear arms, but couldn't leave their state border to do it, Smith's speculates that thumping 2nd Amendment rights would probably be the start of the discourse, followed with perplexity. The counter-response to this discourse could only be that it's safer that way to keep them out of the hands of criminals. But for law-abiding citizens, it may be hard to see why they should have to bear that cost.

in *United States v. Decastro* 682 F. 3d 160 (2012) or the 5th Circuit in *Mance v. Sessions*, 896 F. 3d

699 (2018).  But those 2 decisions were pre-*Bruen* and both have undertaken (and what *Bruen* has

since ruled out) some assessment of the degree of impact the law imposes upon 2nd Amendment

rights.[9]

      In sum Smith perceives the analysis under *Pringle* as follows: if the imposition upon

constitutional rights is *trivial* or in other words "*de minimis*", then the analysis stops there.

However, stopping the analysis on the grounds that the "extent" of infringement appears trivial

appears to be the wrong methodology – assuming the conduct is covered.  The only procedure in

place is to compare the statute to relevantly similar legislation.  A further discussion into this term

of art of "*de minimis*" merits attention to see where it has borne relevance in other contexts.

### D.       <u>The rule of de minimis.</u>

      The term "de minimis" appears to be shorthand for the "venerable latin maxim, *de minimis*

*non curat lex,* ("the law cares not for trifles")".  *Wisconsin Dept. of Revenue v. William Wrigley, Jr.,*

*Co.,* 505 U.S. 214, 231 (1992).   This maxim can be seen in all sorts of contexts.  *Situation*

*Management Systems, Inc. v. Asp. Consulting LLC*, 560 F. 3d 53, 62) (1st Cir. 2009) (copyright

infringement litigation where the Court undertakes an "assessment of substantial similarity" to

determine whether the "*de minimis* copying represents simply the converse of substantial

similarity"); *William Rigley Jr., Co., supra* (*de minimis* doctrine considered in taxation matter where

a court assesses whether a gum manufacturer "Wrigley" minimized its' actions of commerce within

another state so as avoid taxation by that state).

      We have also seen the doctrine have a place at the table with issues more fundamental to

---

[9] Both cases applied some level of constitutional scrutiny in their analysis, but as known (and argued *supra*) that process is no longer appropriate post *Bruen*.  Smith also recognizes the post-*Bruen* decision in *Unites States v. Flores*, No. H-20-427, 2023 WL 361868 (S.D. Tex. Jan. 23, 2023).   However, and in *Flores*, that case involved prosecuting a commercial dealer of firearms under 922(a)(2), and provided no real substantive analysis on a buyer's right to travel over state lines to obtain a firearm for self-defense in violation of 922(a)(3).

protected freedoms – take abortion for example.  *See e.g., Planned Parenthood of Southeastern Pa., v. Casey*, 505 U.S. 833, fn. 5 (1992) ("[A] woman has the right 'to choose to have abortion before viability and to obtain it without undue interference from the State' . . .  Under *Roe,* any more than *de minimis* interference by the state is undue").  *But cf., Dobbs v. Jackston Women's Health Organization,* 142 S. Ct. 2228 (2022) (Supreme Court overruled *Roe* after determining that the right to an abortion is not deeply rooted in the nation's history and tradition and thus denies federal constitutional protection to the conduct, but still leaving open constitutional challenges to statutes based upon a rationally based review).

      The *de minimis* doctrine has also not limited its' operations with a women's right to choose – a right formally protected under the liberty clause of the 14th Amendment.  We have also seen it applied in the 4th Amendment context as well.  *See e.g., Pennsylvania v. Mimms* 434 U.S. 106 (1977) (Exit orders held to be protected under the 4th Amendment, but thereafter also held that the degree of the intrusion upon that right as being "de minimis" – when balanced against the interest of officer safety).  In fact, the analysis undertaken in *Mimms* shows the disparity between what the Supreme Court allows under the Fourth Amendment, but is no longer allowed in the Second – a "judge-empowering 'interest-balancing inquiry' that asks whether the statute burdens a protected interest in a way ***or to an extent*** that is out of proportion to the statute's effects upon other important governmental interest**.'"** *Heller*, 128 S. Ct. 2783 (emphasis added).  *See also Bruen* at 2131. ("While judicial deference to legislative interest balancing is understandable – and elsewhere, appropriate – it is not the deference [which] the Constitution demands here.").  As a result, Smith believes that if his conduct of attempting to purchase a firearm outside his home state is covered under the 2nd Amendment, then any assessment as to how much that conduct infringes upon that right is no longer part of the analysis as directed by *Bruen*.

Finally, Smith asserts that drawing any comparison between the already held *de minimis* restrictions which 922(a)(3) imposes & background checks/safety courses – finding them both "as particular modes of acquiring guns" to "ensure that those bearing arms in the jurisdiction are in fact "law-abiding responsible citizens" – *Pringle* at *7, citing *Bruen* at fn. 9 – but Smith does not see the parallel.  For background checks are designed as suitability tests, enveloped within a lawful exercise of a 2nd Amendment right to bear arms. *See generally Chief of Police of Worcester v. Holden*, 470 Mass. 845 (2015) (discussing "suitable person" standard). But 18 U.S.C. §922(a)(3) appears to have a different design – prohibiting anyone to bear arms across their state border – whether they are suitable or not.  In other words, background checks ***accept as fact*** that a person has to right to bear arms and leaves it to the citizen to prove he/she is not law-abiding.  922(a)(3) ***rejects as fact*** that a person has the right to bear arms in this way, whether he/she is law-abiding or not.  Smith would only see the parallel if 922(a)(3) implemented a background check or some other vetting process to insure that only the law-abiding could travel to Alabama to purchase a gun. As such, Smith simply can't see the marriage between background checks, which permit the exercise of 2nd Amendment rights upon proof of suitability, and 922(a)(3) which simply denies the exercise, suitable or not.

Defining the reason for the background checks (suitability) starts the discussion on how they are distinguished from bans on interstate transport of weapons, but once we define the reason for 922(a)(3)'s prohibition, we get to the point.  For receiving a firearm over state lines would contravene its objective as a "**means** to afford[] circumvention of State and local laws governing the acquisition of [firearms]"). *S. Rep. No. 90-1097*, at 49 (1968) (emphasis added).  Ultimately this realization exposes a means-end analysis that transcends "safety courses", and it has been stated relentlessly that such an analysis is inappropriate for this discussion.  *See supra.*  But to tie it back

into whether this statute walks in lockstep with "background checks", *Bruen's* footnote clarifies that regulatory laws such as background checks, or firearm safety courses are far from assessments which require the "appraisal of facts, the exercise of judgment, and the formation of opinion". *Id.,* citing *Cantwell v. Connecticut,* 310 U.S. 296, 305 (1940).   Here, Smith argues that to deliberate upon how harmful 922(a)(3) strikes against a citizen's overall exercise of 2nd Amendment freedoms must call for a present day *exercise of judgment*.   But this exercise, however, includes no reflection upon the past text and scope of the 2nd Amendment, to simply see if it embraces the conduct (which is prohibited today) of traveling over state lines to purchase a firearm.   Whether it can be looked at that way is at the apex of the legal questions upon which Smith is seeking a ruling.[10]

　　　As a result, Mr. Smith claims that the 922(a)(3) is facially overbroad, as it punishes those (the law abiding citizen) who are exercising protected conduct, for the sake of prohibiting those

---

[10]  Smith closes this all out by suggesting that 922(a)(3) advances the *means* of regulating firearm exchange to serve the modern day *end* of preventing criminals from easier gun access to commit crimes. It's plainly a law to make sure that guns aren't floating all around the place.  Now, and lofty as that goal may be, it still (without dispute) affects a law-abiding citizen's right to exercise the bearing of arms beyond his or her borders. But there is an easy-fix here, although perhaps to the distaste of the government.  Leave law-abiding citizens out of the discussion.  Let Congress criminalize the felons for this conduct and leave any challenges to those same felons to argue that the law is unconstitutionally *applied to them.*  For Congress could easily tailor the statute to criminalize only felons or other prohibited persons from traveling over state lines to purchase weapons, but leave the law-abiding citizens out of the fray.  After all, and this Court has said, the *Bruen* court emphasized at least eleven times in the majority opinion that the Second Amendment protects "law-abiding, responsible citizens." *See id.* at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. *See also Pringle* at *3-4.  Along that line of reasoning it appears that the 2nd Amendment only protects those who meet that standard. *Id.* at *8 citing *Heller,* 554 U.S. 570, 625. As a result, to therefore brush law-abiders and felons together upon the same canvass – and prohibit them ALL as an absolute class from exercising their 2nd Amendment freedoms – appears without reason. If the reason alleged is accountability, Congress should also have no concern about lacking any power to enforce consequence for any ill-advised misdeeds, should they allow law-abiders a passport to travel within their own country bearing arms.  For if any such law-abider decided to go rogue and start passing out weapons - there is a crime for that decision. *See* 922(A)(1)(a).  In sum, 922(a)(3) ends up criminalizes ALL people – responsible and irresponsible people alike – who seek to exercise the receipt or transport of firearms over state lines for self-defense.  This statute behaves in this way without even thinking about the known constitutional distinction between the law-abiding and the nefarious.  This specific piece of legislation rings unconstitutional because it denies outright for ANY citizen – and most importantly, the responsible ones – from this specific exercise.  Smith contends that the legislation is simply too broad and needs some tailoring so that law-abiding citizens can exercise this specific 2nd Amendment freedom.

(felons) who as of present have no protection within this Circuit.  *See United States v. Pringle* at \*4

("this District Court is bound by the decision of the 1st Circuit in *Torres-Rosario*", which holds that

felons have no 2nd Amendment protection to carry).  Smith contends that 922(a)(3) is also

unconstitutional as applied to him for the same reasons as all argued *supra*.  To dismiss all his

arguments under the *de minimis* doctrine, only prompts Smith to beg for reconsideration – with his

overarching argument that any degree of impact assessment does not operate as a stop-gap under a

2nd Amendment analysis.  If this Court agrees, then moving on to determine if there is any

historical analogue with the challenged regulation is the only place to go.

### III.

**THE GOVERNMENT HAS NOT SHOWN THAT A PROHIBITION ON RECEIVING FIREARMS IN A HOME STATE FROM A NEIGHBORING STATE "IS CONSISTENT WITH THIS NATION'S HISTORICAL TRADITION OF FIREARM REGULATION"[11]**

It is the Government's burden to prove that §§ 922(a)(2) and (3), as applied to Mr. Smith,

are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at

2126.  The specific statute under which Smith is charged was enacted in 1968. See 82 Stat. 197,

226-229 (1968).  Moreover, regulations on the first federal proscription against most interstate

transport of firearms appear to have been enacted in 1938. *See Federal Firearms Act of 1938*, 52

Stat. 1250, 1251 (1938). *See also* David T. Hardy, The Firearms Owners' Protection Act: A

Historical and Legal Perspective, 17 Cumberland L. Rev. 585, 589-590 (1987) ("prior to 1934, the

sole federal statue on the subject [of restricting the sale or carrying of handguns] was a 1927 ban on

the use of the mails to ship firearms concealable on the person").  As a result, all of this legislation

is less than a 100 years old, and the *Bruen* court has instructed that courts should not give weight to

"20th-century historical evidence" where such evidence "does not provide insight into the meaning

---

[11] Smith pulls his final section in large measure from Mr. Pringle's argument in *ECF no. 102*.  He saw no need to reinvent the wheel and his following argument is brief as this is the government's burden.

of the Second Amendment when it contradicts earlier evidence." *Bruen* at n.28.  *See also e.g.,*
*United States v. Booker*, 644 F. 3d 12, 23-24 (1st Cir. 2011) ("[G]un dispossession "is firmly rooted
in the twentieth century and likely bears little resemblance to laws in effect at the time the Second
Amendment was ratified.").

Finally, the *Bruen* court stated that "when a challenged regulation addresses a general
societal problem that has persisted since the 18th century, the lack of a distinctly similar historical
regulation addressing that problem is relevant evidence that the challenged regulation is
inconsistent with the Second Amendment." *Id.* at 2131.  Here, Smith is not aware of any such
societal problem regarding the transport/receiving of weapons over state lines beginning in the 18th
century.  Smith will leave it to the government to identify the societal problems of the 1700's about
gun transfers and purchases across state lines which required legislation at that time to address.

For the reasons above, Smith requests the Court rule on the constitutionality of 922(a)(3)
and (2) via the methodology handed down in 2022 under *N.Y. State Rifle & Pistol Assoc. v. Bruen*,
and if it agrees with Mr. Smith's analysis, then dismissing 18 U.S.C. §§ 922(a)(3).

KOBE SMITH
By his Attorney,

/s/ Gordon W. Spencer
Gordon W. Spencer, Esq.
BBO #630488
945 Concord Street
Framingham, MA 01701
(508) 231-4822

Dated:    December 18, 2023

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all counsel of record this 18th
day of December, 2023 via electronic transmission

/s/Gordon W. Spencer
Gordon W. Spencer