UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KOBE SMITH,<br><br>       Defendant. | Criminal No. 22-cr-10157-FDS |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Kobe Smith personally placed orders with a friend in Alabama for firearms and arranged for their transportation from Alabama to Boston. He did so in furtherance of a conspiracy with at least three co-conspirators, in which over the course of a year the co-conspirators brought approximately two dozen firearms from Alabama into Boston for distribution to individuals who could not lawfully possess firearms and who, in several cases, used those firearms in shootings. For his actions, the government respectfully requests that this Court impose a 24-month sentence of imprisonment – at the low end of the Guidelines Sentencing Range (GSR) as calculated by the government – as well as supervised release for three years thereafter.

# FACTS[1]

In summary, between January 2, 2020 and May 27, 2021, the defendant Kobe Smith willfully entered into an agreement with Jahquel Pringle, Jamori Brown, and Brandon Moore, as well as others, to obtain no fewer than twenty-four firearms from Alabama, where Moore lived, and transport them to Massachusetts, where Pringle, Brown, and Smith lived, for their use and for distribution to their associates. Neither Brown, nor Moore, Pringle, or Smith, was a licensed importer, manufacturer, dealer, or collector of firearms. Moreover, Moore and Pringle were felons who were not permitted to possess firearms, and none of the defendants had a Massachusetts firearm identification card permitting them to possess firearms in Massachusetts. PSR ¶¶ 9-12.

**Overview of Conspiracy**

Smith, Pringle, and Brown all knew each other from living on the same street in Boston where Moore had also once lived; ▬▬▬▬▬▬▬, Smith, Pringle, and Brown were also members of the Creston Street gang. *See* Sealed Ex. 1 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ at 44:23, 45:44, 46:20 *et seq.*; Sealed Ex. 2 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ¶ 8; Ex. 3 (USAO_000041, FIO Report from Dec. 9, 2018, indicating that

---

[1] The government relies on and incorporates the facts as set forth in the statement of offense conduct in paragraphs 9 through 23 of the Presentence Investigation Report ("PSR"). Some of these facts are disputed. Specifically, Smith admits that he conspired with Moore for Moore to obtain firearms for Smith in Alabama and transport them into Boston for Smith, but does not admit that he conspired with Pringle and Brown. He also does not admit that at least 24 firearms were transported or that the firearms were distributed to others. To prove these disputed facts, the government offers Exhibits 1 through 6 submitted herewith; the government also offers Exhibit 7 to respond to a separate point made in defendant's response to the government's objections to the PSR. Exhibits 1, 2, and 6 are submitted under seal. The government does not believe an evidentiary hearing is necessary, but rather believes that the Court can decide the issues on the record before it.

Smith, Smith's brother, Pringle, Brown, and one other individual[2] considered an "active Creston member" by Boston Police had been in a car together during a traffic stop). Smith and Pringle had an especially close relationship, and were "ride or die" together, akin to "brothers." *See* Ex. 1 at 40:53 *et seq*. At or around the time of the conspiracy, Smith and Pringle lived across the street from each other on Astoria Street. *See* Ex. 1 at 46:20-46:30.

As part of the conspiracy, Smith and Pringle placed orders for firearms with Moore, after which Moore purchased or otherwise obtained firearms in Alabama. ▇



The first individual ▇ identified as involved was Kobe Smith. Ex. 1 at 15:00, 17:36; Ex. 2 at ¶ 6. ▇ Smith would call Moore through Facebook or ask Moore to call him. ▇ Smith as the individual who ordered the guns and sent people down to pick the guns up from Moore[3]; Moore did not know until they were en route who was coming down. ▇

---

[2] One of the firearms that Moore provided to the co-conspirators was later recovered from this individual.

[3] ▇ identified Pringle as the individual who would call Moore 98% of the time; ▇ consistently stated that it was a group of Creston Street gang members working together (which group he understood to include both Smith and Pringle) who contacted Moore and picked up the guns. *See* Ex. 1 at 31:55 *et seq.*, 28:17 *et seq.*.; Ex. 2 at ¶ 17. And, as specified above, ▇ indicated that Smith and Pringle were very close friends. Indeed, Smith and Pringle were found living together in Washington state at the time of their arrest in February 2023. PSR ¶ 23.

███████ "Kur" (Pringle) and "Live Steco" (Brown) as two individuals that Smith sent down to pick up the guns.

Pringle and Brown physically transported the firearms from Alabama to Boston hidden in their luggage on commercial buses. Pringle made one trip to transport the guns in July 2020, and Pringle and Brown made a second trip to transport additional guns in August 2020. PSR ¶ 12. Altogether, the co-conspirators brought at least 24 firearms obtained in Alabama to Massachusetts. PSR ¶ 14. The co-conspirators distributed the firearms to individuals that they knew intended to use them unlawfully, and who did in fact use them unlawfully. *See* PSR ¶ 15. At least seven of the firearms purchased by Moore's straw purchaser in Alabama in 2020, and provided to the co-conspirators by Moore, have been recovered in and around Boston. PSR ¶ 16.

One of the firearms that had been purchased by Moore's straw purchaser in Alabama on July 14, 2020 was recovered in Boston at the scene of a shooting on July 17, 2020, just three days later, and the same day that Pringle arrived in Boston with it, following his trip to Alabama. PSR ¶ 17. All three of the firearms purchased by Moore's straw purchaser in Alabama on July 30, 2020, and transported to Boston by Pringle and Brown in August 2020, have been recovered in Boston – one on November 13, 2020 in the possession of a then-juvenile suspected of being involved in a shots-fired incident that day, and two on December 17, 2020 in the possession of individuals observed fleeing the area of a ShotSpotter activation. PSR ¶ 18. Moreover, on December 13, 2020, Brown was arrested by Boston Police for possession of a loaded Smith & Wesson Model M&P 40, .40 caliber firearm, which had been purchased by Moore's straw purchaser on July 14, 2020 at The Sportsmans Headquarters in Alabama and transported to Boston by Pringle. Police had responded to a call for a male matching Brown's description in possession of a gun and located Brown at the specified location; the firearm was found in the

4

back yard of the residence. Brown was later identified by a witness as the individual who had had the gun in his hand. The Boston Police Department identified Brown as a member of the Creston Street gang at that time. PSR ¶ 19.

Brown and Pringle confirmed that the conspiracy operated as described above in their Rule 11 colloquies.[4] *See* Ex. 4, Excerpt from Transcript of Brown Rule 11 Hearing, Dkt. No. 147, at 16 ("As part of the conspiracy, Pringle and Smith would place orders for firearms with Moore . . . Pringle and Smith arranged for the transport of the firearms from Alabama into Boston . . . Moore communicated with Smith and Pringle about firearms that he had available or could procure for them in Alabama"); *id.* at 18 (Court asks defendant, "Mr. Brown, do you disagree with anything in the government's description of the facts?" and defendant states, "No, your honor."); *see* Ex. 5, Excerpt from Transcript of Pringle Rule 11 Hearing, Dkt. No. 148, at 18-20 (essentially the same substantive recitation); *id.* at 20-21 (Court asks defendant, "Mr. Pringle, do you disagree with anything in the government's description of the facts?" and defendant states, "No, your honor.").[5]

---

[4] At sentencing, the court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a). *See United States v. Grigsby*, 692 F.3d 778 (7th Cir. 2012) (district court properly applied obstruction of justice enhancement based on documentary evidence, specifically the transcript of the grand jury testimony and the plea agreements of two co-conspirators); *see also United States v. Maximiliano Figaro-Benjamin*, No. 21-1749 (1st Cir. April 30, 2024) (co-conspirator's testimony at co-defendants' trial admissible against third co-defendant at sentencing).

[5] In challenging the government's proof and its reliance on these transcripts, in his response to the government's objections, Smith asks "Why is SMITH's alleged offense conduct (admitted to at his plea hearing) different than his alleged co-conspirators?" PSR at 27-28. Of course, as the defendant knows, the answer is because Smith's counsel told the government in advance of the Rule 11 hearing that he would only be admitting to a subset of the government's allegations; the government alerted the Court to this via email to the clerk as well as on the record at the Rule 11 hearing, and stated that it was only alleging at the Rule 11 the facts to which Smith was willing to admit, but that it intended to prove additional facts at sentencing.

**Smith's Acts in Furtherance of Conspiracy**

On December 29, 2019, Moore sent Smith a Facebook message[6] asking if he still spoke to "Kur," a.k.a. Pringle. Smith responded, "Yeah him and Izzy" which was then followed with a video chat between Smith and Moore. Smith sent Moore a message seven hours later, saying, "Kur said he's good." Moore replied, "Bet." A few days later, on December 31, 2019, Moore and Pringle engaged in multiple calls and messages. PSR ¶ 13(a)-(b).  On or around January 2, 2020, Moore sent Smith a message saying he was trying to get ahold of everybody "to find out what's what" because he was leaving in a few days. Between January 3 and January 6, 2020, Moore and Pringle communicated about a firearm that Moore was procuring for Pringle. On January 6, 2020, Moore sent Pringle a photo of a firearm. PSR ¶ (c)-(d).  On or about January 8, 2020 Moore traveled to Boston. Moore then sent Smith a message on January 9, 2020, saying, "im here nigga." During that trip, Moore provided Pringle a firearm that he had obtained in Alabama in exchange for cash and marijuana. PSR ¶ 13(e).  From this evidence, this Court can conclude that Smith was involved in brokering the gun transaction between Moore and Pringle.

On or around February 24, 2020, after Moore had returned to Alabama, Smith sent Moore several messages indicating that he wanted him to procure one or two firearms for Smith. He specifically stated the following:

> Yo bro when you come back up here.
> Need sumn, just know nese[7] got chased and I'm on that

---

*See* Ex. 7 (email to clerk, with copy to defense counsel, in advance of Rule 11 hearing).

[6] Relevant Facebook Messenger strings reflecting communications between "Bamboozle Moore" (Moore), "Winston Richards III" (Pringle), "Live Steco" (Brown), and "Kobe Latrell Smith" (Smith), produced in discovery as USAO 000173 through 204 and marked SENSITIVE pursuant to the Protective Order in this case, are attached as Sealed Exhibit 6.

[7] "Nese" is a reference to the girlfriend of Smith's brother Shaq. Ex. 1 at 18:11 *et seq*.

Lmk bro I need a good enough deal on 2 and I'll grab it Or 1

Moore responded, saying it would be a few months to which Smith said, "Oh Ight forgetbit ima have something sooner." Moore asked why Nese got chased, to which Smith responded, "Cause they thought she was fw Shaq. So they saw her and chased her." Smith added, "The beef." PSR ¶ 13(f).

On July 3, 2020, Pringle sent Moore a message asking him to call him as soon as possible. That same day, Brown attempted to video call Smith. On July 4, 2020, Smith sent Moore a message asking, "What's ya number." Moore then provided it to Smith. PSR ¶ 13(g). Thereafter, on July 4, 2020, Moore and Pringle communicated about Moore procuring firearms. From this series of communications, and the actions that followed, as well as from ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ this Court can conclude that Smith was involved in placing the order for firearms that Pringle would then pick up.

Later on July 4, Pringle purchased a bus ticket for himself to travel from Boston, MA to Montgomery, AL on or around July 5-6, 2020. He eventually took the trip to Alabama, as confirmed by bus and motel records along with historical cell site information regarding Pringle's phone. On July 14, 2020, Moore caused an individual to purchase seven firearms for him at gun stores in Alabama. On July 15, 2020, Pringle boarded a bus in Alabama while in possession of 12-13 firearms that Moore had obtained for him in Alabama.[8] Pringle traveled with them to Boston, ultimately arriving in Boston with the firearms on or around July 17, 2020. PSR

---

[8] Of those firearms, seven were specifically identified in ¶ 21 of the Indictment.

7

¶ 13(h).  Later that same day, one of the firearms that Pringle had brought from Alabama into Boston was recovered at the scene of a shooting.  PSR ¶ 18.

In late July and early August 2020, Moore communicated with Smith and Pringle about additional firearms that he had available or could procure for them. Moore then sent Pringle and Smith photographs of some of these firearms, with Smith placing orders with Moore for firearms thereafter.[9] PSR ¶ 13(i).  On or around July 30, 2020, Moore caused an individual to purchase three firearms for him at a gun store in Alabama. PSR ¶ 13(j). On or around August 6, 2020, Pringle purchased commercial bus tickets for him and Brown to travel from Boston, MA to Montgomery, AL on or around August 10, 2020. Pringle and Brown then used those tickets to make the trip as scheduled. PSR ¶ 13(k). On or around August 17, 2020, Pringle and Brown boarded a commercial bus in Montgomery, AL while in possession of 12 to 15 firearms that Moore had obtained for them in Alabama. Pringle and Brown proceeded to travel to Boston, MA with the firearms hidden in their luggage, eventually arriving in Boston on or around August 19, 2020. This is verified by historical cell site location records which show Brown's phone traveling from Boston to Alabama between August 10 and 12, 2020, and then traveling back from Alabama to Boston between August 17 and 19, 2020. PSR ¶ 13(l).On August 24, 2020, Moore sent Pringle a message saying, "guess u dnt want dat clip." Moore then sent both Pringle and Smith a photo of two firearms and large-capacity magazines. PSR ¶ 13(m).  From this chain of events and series of communications, as well as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[9] Moore sent a photo of a firearm and a video of a firearm to Smith along with a voice message. Smith did not respond on the text thread.

███████████ this Court can conclude that Smith was involved in facilitating the August 2020 trip as well.

On January 22, 2021, Smith messaged Moore asking him to call him. That same day, Pringle also messaged Moore, saying, "We need to talk." On January 25, 2021, Pringle asked Moore, "Can I place a pre-order for like 3-4? I'll send $$ for Em." PSR ¶ 13(n). From this chain of events, and the events laid out above, this Court can conclude that Smith and Pringle were again, in furtherance of their conspiracy, attempting to procure more firearms from Moore.

On April 24, 2021, Smith messaged Moore again asking him to call him. PSR ¶ 13(o). ███████████████████████ when Smith asked Moore to call him, it was to procure guns. Ex. 1 at 15:48 *et seq*.; Ex. 2 at ¶ 6.

Smith was previously charged in Dorchester District Court after having been arrested on May 29, 2020 by Boston Police along with six individuals on outstanding warrants after police went to Rooms 205 and 206 of a Comfort Inn at 900 Morrissey Boulevard in Boston. Smith was inside one of the rooms with an individual who was placed under arrest. With the consent of the individual who had rented both of the rooms, Boston Police officers searched the rooms. Inside a black and white Nike backpack, officers located a black firearm with a Glock 22 slide with serial number ADM328US on it; the frame/grip appeared to be an aftermarket addition. The firearm was loaded with twelve rounds of ammunition inside a magazine capable of holding 15 rounds. Inside the backpack, officers located a blue folder containing personal papers and an identification card in Smith's name. Smith was then arrested and charged and the case is currently pending. PSR ¶ 21. The firearm recovered from Smith's backpack was later test-fired by the Boston Police Department Ballistics units, and the results were submitted to the National Integrated Ballistic Information Network (NIBIN). The NIBIN results indicated the firearm was

9

linked to seven Boston shooting incidents, which had taken placed between July 17, 2019 and May 3, 2020. In at least three of those incidents, a person had been non-fatally shot. PSR ¶ 22.

After the Grand Jury returned the indictment in this matter in July 2022, Smith failed to appear at a state court hearing in his open illegal gun possession case and did not return an ATF agent's message stating that there was a warrant for his arrest and asking him to call him. *See* Dkt. No. 56 (Government Memo in support of Detention Appeal) at 3-5; Dkt. No. 56-4 (Agent Text to Smith); Dkt. No. 56-7 (Smith Dorchester Docket). Instead, Smith fled to Washington state, where he lived with Pringle until law enforcement located and arrested them there in February 2023. *See* PSR ¶ 23; Dkt. No. 56 at 3-5.

## DISCUSSION

### I. Sentencing Guideline Calculation

Probation has calculated defendant's total offense level as 10, which the government disputes (as discussed further below). Probation has calculated the defendant's criminal history category as I, with which the government agrees. Based on its calculations of a total offense level of 10 and criminal history category I, Probation has calculated a guideline sentencing range ("GSR") in this case to include a term of incarceration from 6 to 12 months, to be followed by a term of supervised release of one to three years; a fine of $4,000 to $40,000; and a special assessment of $100.

The government disputes Probation's calculation of the defendant's criminal history level and consequently also its calculation of his GSR. Probation appears to have limited its view of the conspiracy that Smith joined to the conspiracy that he was willing to admit to at his Rule 11 hearing, *i.e.,* a conspiracy with only Moore to bring one or two guns back to Massachusetts for Smith's personal use. Through the exhibits provided herewith, the government has demonstrated

by a preponderance of the evidence that Smith's conspiracy was not simply between him and Moore, but rather was an agreement with Moore, Pringle, and Brown to bring firearms from Alabama into Massachusetts. Although the agreement itself, plus *some* act in furtherance is all that is needed to establish the conspiracy, here the government has also demonstrated a nexus between Smith and *all three* occasions on which Moore provided firearms to individuals in Massachusetts: in January 2020, in July 2020, and in August 2020. Accordingly, it is proper for him to be held responsible for the full number of firearms involved in the conspiracy and for the trafficking of those firearms that the conspiracy engaged in. *See United States v. Dunston*, 851 F.3d 91, 101 (1st Cir. 2017) (holding, in a drug case, that when a defendant has been convicted as a co-conspirator, the sentencing court must consider reasonably foreseeable acts in furtherance of the conspiracy). *See also* USSG § 1B1.3(a)(1)(B) (delineating relevant conduct to consider for sentencing ranges in the case of a jointly undertaken criminal activity).

As the government notes in its Objections to the PSR, because the offense involved greater than seven firearms but fewer than 25, and that was reasonably foreseeable to Smith, the offense level should be increased by four points. USSG § 2K2.1(b)(1)). Likewise, because the conspiracy engaged in was the trafficking of firearms, and that was reasonably foreseeable to Smith, the offense level should be increased by an additional four points. USSG § 2K2.1(b)(5).[10] Both of

---

[10] For this enhancement, the government relies on the 2018 version of the USSG that was in effect at the time of the offense; the 2021 version contains the same enhancement. Under the version effective November 1, 2023, a 5-level enhancement would be appropriate under USSC § 2K2.1(b)(5); however, to avoid any potential *ex post facto* issue, in an abundance of caution, the government suggests applying the lower 4-level enhancement provided by the Guidelines in effect at the time of the offense. *See United States v. Monroe,* 2021 U.S. App. LEXIS 40207, at *3-*4 (1st Cir. Nov. 10, 2021) (concluding the district court did not commit reversible error in sentencing a defendant within the Guidelines range effective at the time of sentencing, even though that represented a substantial upward variance from the guidelines range prescribed by the earlier version of the Guidelines; in that case, the district court, "recognizing the somewhat unsettled state of the law in this area, carefully calculated the GSR under both potentially

these specific offense characteristics were applied for Smith's co-conspirators, Brown and Pringle, and both are amply supported by the facts laid out above and proven by a preponderance of the evidence through the exhibits.

After these offense characteristics have been applied, given that the defendant has accepted responsibility for the elements of the offense, the defendant's offense level would be decreased by three, bringing his total offense level to 17. Therefore, the government urges the Court to find that, with a TOL 17 and CHC I, Smith's GSR is properly calculated as 24-30 months. *See* PSR at 25-26 (confirming that if the Court applies the enhancements urged by the government, the defendant's GSR would be 24-30 months).

## II. **Application of the Section 3553(a) Factors**

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). These factors include the nature and circumstances of the offenses and the history and characteristics of the defendant, and the need for the sentence imposed to satisfy the statutory purposes of sentencing. They also require courts to consider the kinds of sentences available, the applicable guidelines, pertinent Sentencing Commission policy statements, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. In this case, these factors point to a sentence of imprisonment of 24 months and three years of supervised release.

---

applicable versions of the guidelines and explained why it would impose the same sentence under either version").

A. **<u>Nature and Circumstances of the Offense; Need for Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment and Deterrence, and Protect the Public</u>**

The nature of the offense is quite serious. Smith has pleaded guilty to one count of Conspiracy to Commit Illegal Transportation or Receipt in State of Residency of Firearm Purchased or Acquired Outside of State of Residency in violation of 18 U.S.C. § 371.

Because of the conduct by the defendant and his co-defendants, dozens of firearms have been illegally transported into and distributed on the streets of Boston and surrounding communities. At least seven of the firearms purchased by Moore's straw purchaser in Alabama in 2020 and provided by Moore to Pringle and/or Brown, have been recovered in and around Boston. PSR ¶ 16.

At least two of the individuals from whom the firearms provided by Moore were recovered were considered to be active members of the Creston Street gang by Boston Police at the time, and at least three of the individuals from whom the firearms provided by Moore were recovered were felons with prior unlawful firearm possession convictions. PSR ¶ 17. Most disturbingly, one of the firearms that has been purchased by Moore's straw purchaser in Alabama on July 14, 2020 was recovered in Boston at the scene of a shooting the same day Pringle arrived in Boston with the firearm, following his trip to Alabama. PSR ¶ 18. Likewise, all three of the firearms purchased by Moore's straw purchaser in Alabama on July 30, 2020, and then transported to Boston by Pringle and Brown in August 2020, have been recovered in Boston – one on November 13, 2020 in the possession of a then-juvenile suspected of being involved in a shots-fired incident that day, and two others on December 17, 2020 in the possession of individuals observed fleeing the area of a Shotspotter activation. Both of these firearms were also loaded with large capacity magazines at the time of recovery. PSR ¶ 19. Accordingly, the harms

associated with gun trafficking are not theoretical in this case – they are quite real.

The scourge of gun violence in Boston is well-documented. Between January 1 and December 31, 2020 (the year in which the co-conspirators brought the guns from Alabama into Boston), Boston recorded 44 fatal shootings and 231 non-fatal shootings. *See* https://data.boston.gov/dataset/shootings (last accessed July 5, 2024). Any sentence in a case such as this must take into account the harms that the proliferation of illegal firearms and their delivery to individuals not permitted to possess them causes to the community, and the danger that the unrecovered firearms from this particular crime pose to the community right now.

The defendant, though young, was not the youngest member of this conspiracy, nor was he the least involved. Indeed, he was the person with the personal relationship with Moore who was able to facilitate the transactions; without him, this conspiracy could not have achieved its goals.

A sentence of incarceration of 24 months is the lowest sentence necessary in this case to reflect the seriousness of these offenses, to promote respect for the law, to adequately punish the defendant for his criminal conduct, to deter him and others from offending in the same way again, and to protect the public.

B. **The History and Characteristics of the Defendant**

The government acknowledges certain points that are reflected in the PSR, including that the defendant had a difficult, unstable childhood that involved separation from both parents and even his siblings for a period of time and ultimately his mother's death. The government notes that despite the turbulence in his upbringing, the defendant was able to complete high school at the O'Bryant school in Boston and complete one semester at community college, and that he was gainfully employed and helping to raise his young son at the time of his arrest. The government

14

acknowledges that the defendant was 20 years old at the time that he began this offense. Because of his age, the defendant has limited adult criminal history (one unlawful firearm possession case currently in default status) and has never served an adult prison sentence. The government acknowledges that the defendant has made some positive choices during his pre-trial detention including completing programming and maintaining employment at Wyatt. PSR ¶ 5.

However, the government must also consider the defendant's prior conduct (PSR ¶ 21) and his role in funneling the firearms into the hands of individuals who could not legally possess them and who, at least in a couple of known occasions, engaged in violent crime with them. The whereabouts of more than half of these firearms are still unknown.

In light of all of these factors, a sentence of 24 months imprisonment, with three years of supervised release, is sufficient, but not greater than necessary, to accomplish the goals of sentencing set forth in § 3553(a). The defendant is expected to receive over 17 months of credit for time already served (*see* PSR ¶ 2, reflecting that defendant has been in custody since Feb. 2, 2023); accordingly, if the government's recommended sentence is imposed, he will soon have the opportunity to demonstrate to the Court his intention to start afresh and be a good father to his son, with the support of Probation during his three years of supervised release.[11]

### C. Avoiding Unwarranted Sentencing Disparities

The government's recommended sentence is in line with national sentences for similar crimes by defendants with similar criminal history. The government re-ran the JSIN data to reflect its calculation of the defendant's offense level as 17. JSIN data show that over the last five fiscal years, there were 849 defendants whose primary guideline was § 2K2.1, with a Final

---

[11] He will first need to clear up the default warrant in the open gun case in the Dorchester Division of the Boston Municipal Court. PSR ¶ 43.

Offense Level of 17 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 707 defendants (83%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 21 months and the median length of imprisonment imposed was 24 months. *See* https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last accessed June 4, 2024).

Additionally, the government's recommended sentence is proportionate to the sentences received by Smith's co-conspirators in this District and his role in the conspiracy.

- In the government's view, Smith's co-defendant Jahquel Pringle is most culpable in the conspiracy. Although the conspiracy could not have succeeded without Smith, Pringle was also involved in making arrangements for procuring the firearms and physically brought them from Alabama into Boston. He must have been involved in the distribution of the firearms he brought back in July 2020, which led to one of them getting into the hands of someone who fired it in Boston that very same day. He was also the oldest of the charged Massachusetts co-conspirators. The government's recommendation of 48 months for Pringle – twice its recommendation for Smith – reflects this higher level of culpability. Ultimately the Court imposed a sentence of 42 months for Pringle (*see* Dkt. No. 155), which the Court expressed concern may be too lenient; again, this sentence is much higher than what the government recommends for Smith, reflecting their different culpability.

- The role of Smith's co-defendant Jarmori Brown was much more limited than Pringle and substantively different than Smith's. Brown had just turned 18 years old in June 2020, just before the trips to Alabama, and was the youngest of the co-conspirators. Brown was involved in only one of the two trips. He did not appear to be personally

involved in the ordering of the firearms, although he did personally receive one. The government recommended 27 months in prison for Brown, reflecting the low-end of the GSR; the Court noted that this was a fair and appropriate recommendation. *See* Dkt. No. 120 (Transcript of Brown Sentencing Hearing). Ultimately the Court sentenced Brown to 18 months in prison. Dkt. No. 96. The court expressed concern regarding possible over-incarceration given that Brown also had state sentences pending at the time of his sentencing hearing in which he was expected to receive a sentence of at least 30 months[12]; because he had been in state custody throughout the federal prosecution, he would not receive any credit off his federal sentence. *Id.* Ultimately, although the Court expressed its reservations in imposing a shorter sentence in light of the gravity of the firearm trafficking offenses, it ultimately sentenced Brown to 18 months. *See id.* Accordingly, his combined state and federal sentence for the various gun-related charges he had pending at the time (including an unlawful possession charge for possessing one of the firearms that the Massachusetts co-conspirators had obtained from Moore) was 48 months. The government's recommendation for Smith is lower than its recommendation was for Brown, reflecting the differences in their criminal history (CHC II for Brown vs. CHC III for Smith); while somewhat higher than the Court's sentence for Brown, it is <u>half</u> the total sentence of incarceration that Brown received in his state and federal cases combined.

---

[12] Brown did, in fact, ultimately receive a 30-month sentence in the state. *See Commonwealth v. Jarmori Brown,* 2284CR00215 (30-month sentence imposed on attempted A&B with a firearm charge); *Commonwealth v. Jarmori Brown,* 2284CR00071 (30 month concurrent sentence imposed on accessory after the fact charge); *Commonwealth v. Jarmori Brown,* 2184CR00750 (30 month concurrent sentence imposed on carrying firearm without license).

Accordingly, the government's recommendation of 24 months is consistent with the §3553(a) goal of avoiding unwarranted sentencing disparities, both nationwide and with respect to his co-conspirators based on relative culpability.

## CONCLUSION

For the foregoing reasons, and those to be articulated at the sentencing hearing, the government respectfully recommends that this Court impose a low-end guideline sentence of 24 months imprisonment, to be followed by a term of supervised release of three years; and the mandatory special assessment of $100. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:  */s/ Elianna J. Nuzum*
Elianna J. Nuzum
Assistant United States Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
elianna.nuzum@usdoj.gov
617.748.3100

July 5, 2024

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Elianna J. Nuzum*
Elianna J. Nuzum
Assistant U.S. Attorney

July 5, 2024