UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**KOBE SMITH, et. al** | Case No. 22-cr-10157-FDS |

## SENTENCING MEMORANDUM OF KOBE SMITH

### INTRODUCTION

> "Whoever knowingly violations subsection. . . [922(a)(3)] . . . of section 922 shall be fined as provided in this title, imprisoned not more than 5 years or both".

*18 U.S.C. § 924 (a)(1)(D).*

### THE DEFENDANT'S RECOMMENDATION

NOW COMES THE Defendant, Mr. Kobe Smith ("Mr. Smith" or "Smith") and upon his conviction of 18 U.S.C. § 922(a)(3), Smith requests that this Court impose a sentence of **"time-served"** for the violation of the aforementioned statute. To be sure, Mr. Smith has no record and has been held in custody (now) in connection with the crime relevant to sentencing for over **17 months.** *See Presentence Report of Mr. Kobe Smith* ("PSR") at page 1 – ("Detained in federal for the instant offense" since "February 2, 2023"). Comparing that period of active incarceration to the PSR's recommended guideline sentencing range ("GSR") of **6 to 12 months**, and if this Court agrees with that range, Mr. Smith's present state of incarceration well exceeds that range. As this memorandum will establish below, and again if this Court accepts probation's calculation, there are NO aggravating or enhancing factors to warrant an upward

variance.  As such, any sentence of more than 17 months would be *unreasonable*, as it would be greater than necessary to accomplish the goals of sentencing and particularly where another person *alleged* to be a part of the conspiracy (and with more culpability) received **18 months.**[1]

We can ask why should Mr. Smith sit along the sentencing spectrum at 17 months, and thereby reject the government's recommendation of 24 Months?  *See Gov't Sentencing Memorandum* at page 1.  The answer would be that: 1) Mr. Smith has no juvenile or adult convictions – *PSR* at ¶¶ 38 and 39; 2) Mr. Smith NEVER himself participated in any substantive violation of his crime – as he not once received and/or even transported one firearm from state to state, let alone *agreed* for others to traffic in excess of 20 guns along this pipeline; and 3) the lion share of Mr. Smith's conduct consisted of him asking only one co-conspirator (Mr. Brandon MOORE –the single person upon whom he conspired) to purchase or gun or two for protection – a reason which is also protected by the constitution.  To be sure however, and for purposes of sentencing, Mr. Smith has abandoned the notion that our 2nd Amendment protects the conduct of non-felons obtaining weapons *over state lines* for self-protection, and he mentions only now for purposes of sentencing mitigation.[2]

For while Mr. Smith is quite guilty of the crime for which he plead guilty, his same offense conduct would be quite legitimate had he asked a local resident for the same weapon

---

[1] *See* 1:22-cr-10157-FDS-3 at docket entry # 95, where Mr. Jarmori Brown was sentenced (who without question had a more active and culpable role in the alleged conspiracy) to **18 months** for his participation.  *See also* 1:22-cr-10157-FDS-2 at docket entry # 155, where *alleged co-conspirator* and **felon** Mr. Jahquel Pringle received **42 months**.  As known, Mr. Pringle is also (without question) a more active and culpable player in the alleged conspiracy.

[2] *See dkt entry* #122 – Kobe Smith's Motion to Dismiss asserting that his offense conduct (asking to purchase a gun or two from MOORE – an Alabama resident) was protected under the 2nd Amendment, and that any crime associated with the same infringed upon his right to bear arms for self-defense.  Mr. Smith's plea of guilty waived such a claim but he still asserts that this Court could consider a non-felon like himself still worthy of leniency since he could commit the exact same conduct via alternative channels.  *See dkt entry* #132 – this Court's DENIAL of Smith's Motion to Dismiss, opining, *inter alia,* that Section 922(a)(3) "leaves open "ample alternative means of acquiring firearms for self-defense purposes".  Id. at *4 (citation omitted).  In sum, there can be no conclusion that Mr. Kobe Smith will be sentenced NOT for doing what he sought to accomplish, but actually how he went about doing it.

instead of asking Mr. Brandon MOORE for it.  In any event, Mr. Smith states that: a) his present GSR range of 6-12 months; b) his present duration of incarceration; along with c) his lack of participation and *agreement* within the scope of the overall conspiracy - should be the dispositive metrics to determine his proposed sentence, and with time served of 17+ months being more than enough time in prison - all things considered.

## THE GOVERNMENT'S RECOMMENDATION

Coming as no surprise, and as told, the government's position on sentencing places Smith higher on the sentencing spectrum – but actually not by much, and which further magnifies that there is not much of a controversy to consider.  Their position however relies in no way upon Smith's record – which of course is pristine in terms of lack of convictions, let alone that Mr. Smith in a societal context appears to be a hard-working and responsible parent.  *See PSR* at ¶¶ 49-50; 56-62.  Their sentencing request will be exclusively based upon some questionable sentencing enhancements in terms of applicability, and which probation has already rejected as being convincing.  *PSR* at page 25 – "Probation Officer's Response to Government Obj. 1-3.

The sentencing enhancement upon which the government relies can be found at pages 24 and 25 of the PSR (the addendum section), where the government objected to probation's calculated GSR of 6-12 months.  According to them, their alternative calculation would be 24-30 months, and due to various 4 point enhancements (USSG §2K2.1(b)(1) and (4)) for *trafficking* in firearms in amounts *greater than 7* firearms but fewer than 25.  *Id.,* at page 25 (objection #4).[3]

---

[3] The government's sentencing memorandum comes on the heels of their objections, where their recommendation of **24 months** is by the way only 7 months greater than Smith's recommendation of 17 months**.**  As an interesting aside, the government recommended **27 months** for Jarmori Brown, who by all accounts was the one who traveled to Alabama to commit overt acts in furtherance of the conspiracy.  *See dkt entry* # 92 at page 1. Hence, we have a 3 month disparity in sentencing requests between: 1) Smith, who did NOTHING by way of traveling, receiving, and/or distributing guns; and 2) Brown who did EVERYTHING to make the aforementioned happen.  Brown also had a CHC of III or II and Smith has a CHC of I.  *Id.*  Lastly, and where ultimately the Court sentenced Brown to 18 months incarceration for his role in this crime, the undersigned simply can't see a path where Smith should receive a sentence more than or even equal to the more active and culpable alleged co-conspirator.

For the record, the government's suggested GSR which also includes their proposed sentencing enhancements cannot be proven with *reliable* evidence, but that didn't stop them from trying to make the case of *reliability* within the PSR.  *See PSR addendum* at pages 24-25.  Smith has also objected to the same. *See addendum* at pp. 26-30.  The government's proof on their proposed enhancement?  Surely not any evidence coming from Smith's own mouth that he shared in any agreement with Mr. Jahquel Pringle or Jarmori Brown to traffic dozens of weapons from Alabama to Massachusetts.  Nor any actions engaged in by Smith to evince the same agreement.  Furthermore, we do not see one document generated **during the course of the conspiracy** to help out in the discussion.  Instead of the government producing for this Court the reliable evidence we typically see to establish such conspiracies, they simply argue in conclusory fashion that the record supports it.  Their foundational argument in support of that conclusion?  Well for starters, Smith was the brains and master-builder behind this operation to support his initial detention.

   a. **For starters, the government sought to detain Mr. Kobe Smith with a theory that a non-felon (like him) would stay at home in Massachusetts while he sent felons (like Jahquel Pringle) across state lines to do his dirty-work.**

The subheading above (for the record) is not something which has just appeared in the final moments of sentencing.  For we have heard this governmental mantra about Smith being the general contractor to advance this east coast gun trafficking conspiracy from the outset, and starting once Smith first went into custody out west.  For when a magistrate judge in the District of Oregon questioned the extent of Smith's alleged involvement, we get this following response from the west-coast AUSA to help in their argument to detain Mr. Smith at his initial appearance.

> MR. SINGH:     "And Judge, my information comes by phone call with the prosecutor on this case. That's how I received these facts. The prosecutor informs me that Mr. Smith was the individual who knew the

4

> conspirators in Alabama. He was the person who had the contacts with the individuals in Alabama. He was the one who could arrange for them to procure firearms and then provide them to others who traveled from Massachusetts down to Alabama to bring them back, Mr. Pringle being one of those".

*Dkt* 56-9 at page 8.[4]

The date of AUSA Singh's statement was February 9, 2023. Now some 17 months later, Smith STILL has not seen the evidence to support Singh's claim that he was such an architect of this pipeline of gun trafficking. To be sure, this realization of missing evidence comes long after the termination of the conspiracy, as well as Mr. Smith's plea of guilty which has now also come many moons later. Even during Mr. Smith's Rule 11 hearing were the facts specifically tailored so his admission was only to the elements – necessarily excluding Pringle and Brown from his admitted offense conduct.[5]

Moving onward to sentencing, only now do we hear the government's whole story on their ***theory*** against Mr. Smith, but that story still provides NO true persuasive value to conclude that Smith was an architect or even a henchman in the context within the entire scope of the conspiracy. Part of their presentation even moves away from the conduct of the parties within the conspiracy itself, but rather, has gleaned a one word answer from two Rule 11 transcripts – from Pringle and Moore. This one word answer comprises of both defendants merely following the government's tail after the government read their own desired narrative into evidence. What

---

[4] Mr. Smith also notes that in the months to follow after this initial statement by AUSA Singh, and up to and including the present moment of sentencing, at no time has the government specifically alleged that Mr. Kobe Smith was an organizer or leader for the purpose of seeking a sentencing enhancement under U.S.S.G. sec. 3B1.1(a).

[5] Mr. Smith does not mean to suggest that the government did this "tailoring" because they themselves believed Smith was *innocent* of conspiring with these folks. As seen in their sentencing memorandum that is quite far from the case. The facts at Mr. Smith's Rule 11 hearing were simply limited to the elements because Smith has maintained from the outset of this case that he was in fact *innocent* of conspiring with no more than one person (just Mr. Brandon MOORE) to violate 18 U.S.C. § 922 (a)(3). Therefore, the parties obviously realized that the issue became not one of Smith's guilt or innocence of the crime but rather the extent of his guilt for sentencing purposes. As a result, the Rule 11 was crafted to have Smith only plead guilty to the elements, but along with the government reserving their right to prove the scope of Smith's involvement at sentencing.

follows is the sum of the government's argument in support of Smith's alleged agreement to traffic 24 guns from Alabama to Boston, which also includes these Rule 11 hearings.

### b. Sealed exhibits[6].

The government relies upon 2 sealed exhibits to prove Mr. Smith's alleged agreement With Pringle and Moore. These exhibits provided the following allegations:

1) Smith Pringle and Brown all knew each other from living on the same street in Boston where Moore had also once lived;

2) Smith, Pringle and Brown were also members of the Creston Street gang;

3) Smith and Pringle had an especially close relationship, and were "ride or die" together, akin to "brothers";

4) A claim that "people" had reached out to Moore, stating "they" would send "people" down to pick the firearms up, and that it was a "group" doing this, and confirmed that it was Creston Street gang members who were buying the guns and coming down to get them.

For starters, who are these "people"? From its plain language, it appears it's the Creston street gang who is alleged to be responsible for all of this gun trafficking. However, and from review of the indictment, there is no allegation that a RICO conspiracy was in force to traffic guns from Alabama to Massachusetts, let alone any admission by Smith that he is gang-affiliated. More importantly, the documentary evidence in support of their claim of Smith's gang membership – government exhibit 3 – only provides evidence of a motor vehicle stop where Mr. Smith and his brother are in the car with Jarmori Brown and Jahquel Pringle. An exhibit comprising of an "FIO" which hardly moves the needle. For our own circuit has recognized the "flimsy – indeed, arguably nonexistent – link between [ ] FIO's. . . and the conclusion that [Kobe Smith] is a gang member". *See Diaz-Ortiz v. Garland,* 23 F 4th 1, 21 (2022) (1st Circuit finding that the Boston

---

[6] Smith will go into the claims without providing any basis to believe or infer the source of the information. Smith has not redacted any portions of his sentencing memorandum in light of *United States v. Kravetz*, 706 F. 3d 47, 57 (1st Cir. 2013) ("[S]entencing memoranda are judicial documents subject to the common law presumption of public access").

Regional Intelligence Center's database which included a point system based upon FIOs "does not contain 'reasonable, substantial, and probative evidence' of gang membership association). As such, and even assuming as true the government's uncharged claim that "Creston Street" was the enterprise behind this interstate transportation of firearms, this Court is still without the evidentiary tools to find by a preponderance of the evidence that Kobe Smith was a member of this gang, let alone that he acted in furtherance of any criminal enterprise by *agreeing* to the actions of any alleged gang-members involved in that aspect of the crime.

The government's sealed exhibits go on further to claim the following:

> 1) Smith was identified as the person calling Moore to order guns, and thereafter sent people down to pick up the guns.

But then however, and in another section on the same page of this sealed exhibit we see another competing if not inconsistent claim:

> "PRINGLE . . is "Top dog" [ ] and was the one that would call MOORE 98% of the time to set up the gun transactions.

*Id.* at page 3.

For the record these claims are given by the same person, and it's hard for both of them to co-exist. For either Smith is the "Top dog" – a non-felon who is "setting up" the gun transactions, and does so by sending a felon (PRINGLE) to do his dirty work, or, PRINGLE is the true "Top dog" – a felon who "sets up" 98 percent of the time the gun transactions with no apparent help, management, or supervision. Based upon these two conflicting statements, there is no way to resolve the conflict – unless we have live testimony on it, or some other independent evidence to help clarify one theory over the other. We don't. Instead, we simply have these 2 conflicting statements made by one person on this point, and with both statements fighting with each other. Without more helpful evidence to understand how both statements could co-exist, they must necessarily cancel each other out, and especially considering that the statements were

7

made after the termination of the conspiracy, which generally are considered unreliable hearsay in any event. *See Bourjaily v. United States*, 483 U.S. 171 (1987) (before considering truth of statements under Rule 801(d)(2)(E) the Court must determine by independent evidence that the conspiracy existed and quantum of proof on the determination and circumstances of the statement to determine its reliability). Of course, the only evidence of the existence of the conspiracy (involving Smith) would come from the same hearsay statement in the sealed exhibit.

Now, and while Smith concedes that such hearsay statements would be admissible at sentencing, the notion of reliability still serves as the ultimate gate-keeper before this Court should consider them. The Sentencing Guidelines provide that a sentencing court may rely on "relevant information without regard to its' admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its' probable accuracy." USSG sec. 6A1.3. This rule is one which has Constitutional implications. *See United States v. Silverman*, 976 F. 2d 1502, 1504 (6th Cir. 1992) (en banc) (The Due Process Clause of the Fifth Amendment also imposes a minimum standard of reliability for evidence admitted at sentencing). With the Constitution in mind, it should come as no surprise that the requisite level of reliability necessarily must include helpful and detailed facts – ones which also evince the basis of the declarant's belief to make them. *See United States v. Lowenstein*, 108 F. 3d 80, 83-84 (6th Cir. 1997) (concluding that the evidence did not contain sufficient indicia of reliability where the district court "relied solely upon a hearsay statement" that did not mention the factual basis for the belief of the [declarant]"). *See also United States v. Moncivais*, 492 F. 3d 652, 659 (6th Cir. 2007) (Court of Appeals affirming the introduction of a co-defendant's proffer statement of sentencing, as it survived a due process challenge, as the proffer statement was "richly detailed" and "***both internally and externally consistent***") (emphasis added).

This is where all the government's claimed evidence to show Mr. Smith's involvement in this broader conspiracy involving PRINGLE and BROWN falls down.  For whether the evidence comes from a "flimsy" FIO or from some other person made after the termination of the conspiracy who will never be cross-examined in court, and where the statement this person gave was not "***internally and externally consistent***"***,*** these pieces of evidence standing alone, or even in combination cannot carry the day.   For neither piece of evidence reveals that Kobe Smith:  1) ever spoke of his assent to an agreement with Pringle and Brown; or 2) ever acted consistent with the same agreement.  Even probation, once they reviewed the government's evidence came to the same conclusion that:

> The Probation Department does not believe that [the government's evidence] supports that the defendant arranged for the transport for the firearms, or that he possessed more than one firearm.

*PSR at* page 25.

The problem then for the government is first:  The lack of Mr. Smith expressing his responsibility for the enhancement; and then second: a lack of *reliable* evidence to prove otherwise.  Actually, the lack of governmental evidence on Mr. Smith's agreement to conspire with Pringle and Brown is so deficient that they had to go outside the evidence collected against all the alleged co-conspirators during the actual investigation, before finding something to argue. Furthermore, this evidence hails not only from a period of time post-conspiracy but also post-indictment.  To complicate matters even further frankly, the evidence has a bit of a manufactured nature to it.  What Smith is referencing are the Rule 11 transcripts of Pringle and Brown.  *See gov't sentencing exhibits 4 and 5*.  A quick review of the same merely demonstrates both defendants simply acquiescing to the government's reading of their desired narrative, and arguably to ensure they are sentenced consistent to what was promised to them in their plea agreements.  *See dkt entries* #73 and 140.  Smith has yet to hear a persuasive argument that the

9

submission of these transcripts carry any indicia of reliability – not with respect to the fact that Pringle and Brown's guilty pleas were made knowingly and voluntarily – but rather to now find them of value to ratchet up Smith's GSR from where it presently sits as calculated by probation.

    **c.**    **Rule 11 admissions of guilt by PRINGLE and BROWN.**

*Introduction*

According to the indictment, the alleged conspiracy began "no later than January 2, 2020 and continued until at least May 27, 2021. *Dkt entry #3* at ¶5. Between those two dates, the only evidence against Smith *reliably* proving: 1) what he knew; and 2) what he agreed to - consisted of the following statements that Smith made to Moore on February 24, 2020:

> SMITH: You bro, when you coming back up here, Need sumn, just know Nese got chased and I'm on that. Lmk bro, I need a good enough deal on 2 and I'LL grab it or more
>
> MOORE: It will be a few months
>
> SMITH: Oh ight, forgetbit ima have something sooner".

*PSR* at ¶13f.[7]

Moving forward from this specific request by Smith to purchase a firearm for himself (to protect others) in early 2020, and arriving until the end of the alleged conspiracy in May of 2021, we see the following (and only) behavior by Smith:

1) July 3rd, 2020 Brown attempted to video call Smith. *Id.* at ¶13g.

2) July 4th, 2020 Smith sent Moore a message asking "what's ya number". *Id.*

---

[7] Looking within the government's sentencing memorandum, we see claims about Moore texting Smith **before** the conspiracy began – with Moore asking Smith if he (Smith)" still" spoke to Pringle – with Smith responding "[Pringle] said he's good". *PSR* at ¶13a. The inference here is that Moore was looking for Pringle, not Smith. Then on January 2, 2020 (the actual onset of the conspiracy), Moore sent Smith a message saying he was trying to get a hold of everybody to "find out what's what" because he was leaving in a few days. *Id.* at ¶13c. There is NO evidence that Mr. Smith ever responded to this specific request by Moore posed at the onset of the conspiracy. Then on January 9th, 2020, and after Moore and Pringle communicated **exclusively** with each other for days leading up to the 9th, Moore came up to Boston and provided Pringle with a firearm. *Id.* at ¶13e. For the record, there is NO evidence that Smith had anything to do with that gun transaction – let alone with the many communications between those two leading up to that transaction.

3) Moore sent a photo of a firearm and a video of a firearm to Smith and Smith did not respond. *Id.* at ¶13i.

4) August 24, 2020 Moore sent Smith a photo of two firearms and large capacity magazines.   There is no evidence that Smith responded. *Id.* at ¶13m.

5) January 22, 2021 Smith messaged Moore asking him to call him; *Id.* at ¶13n; and

6) April 24, 2021, Smith again messaged Moore asking him to call him. *Id.* at ¶13o.

For starters, if the government had some helpful evidence to explain Smith's agreement to the Pringle/Brown/Moore gun trafficking conspiracy, it should have been stated above.  All which is chronicled are phone and text communications between Smith and Moore but which actually don't mention Pringle or Brown.  Smith has contended and he still maintains that he was a "lone wolf" in his relationship with Mr. Brandon Moore.  *See PSR addendum* at 27 (citing to *dkt 66* at page 7).  On a final note we see that in Smith's texting with MOORE, no mention is made about Smith sending anyone over state lines to purchase guns, even himself.  Rather, Smith appears content with trying to obtain a gun the next time MOORE comes back into the town.  *Id.* at ¶13f.  Then there is the final piece of mitigation - Smith doesn't even follow through with buying a gun from MOORE.  He calls it off by stating "forget it" because "he might "have something sooner".  *Id.*

What is the take away from this body of evidence?  With all the phone dumps, and with all the investigative efforts of law enforcement during the actual conspiracy itself, Smith's conduct appears rather isolated.   It would thus make sense how Mr. Smith could be called a 2 percent participant within the alleged conspiracy in lieu of being the "top-dog" - with 98 percent of the crimes alleged residing on Pringle's side of the equation.  So, and knowing this, what does the government do when confronted with such a dearth of evidence against Smith, other than him being an isolated player?  They try and shoehorn SMITH into the broader conspiracy via Rule 11 hearings with Pringle and Brown.

11

*Jarmori Brown*

On March 29th, 2023, Jarmori Brown pleads guilty to the crime with the government reading the following allegation into the record:

> "Jarmori Brown, also known as "Live" willfully entered into an agreement with Jahquel Pringle, Colby (sp) Smith, and Brandon Moore as well as others to obtain no fewer than 24 firearms from Alabama and transport them into Massachusetts, where Pringle, Brown and Smith all lived for their use and for distribution to associates".

*Dkt 162-2* at page 5.

Moore was then asked by the Court does he "disagree" with the government's description. *Id.* He of course did not disagree, as he was there to plead guilty to the government's facts. For Mr. Brown to edit or clarify the names of the co-conspirators named by the government does not: 1) alter the elements of the offense; 2) absolve him of criminal liability; 3) reduce his guideline sentencing range; let alone 4) affects his ultimate sentence in any conceivable way. For what it's worth, we don't even know for sure if Jarmori Brown even listened to the government's recitation of facts, perhaps just sitting there waiting for it all to be over so he can be sentenced and eventually go home to his family. It would be entirely something else if this Court asked Mr. Brown to name the persons with whom he conspired and Mr. Smith was so explicitly named. Or even more helpful, if Mr. Brown were asked: "What did Mr. Smith have to do with you and Mr. Pringle bringing 24 guns into Massachusetts and please specify that involvement?" If not, Mr. Smith would love to ask Mr. Brown that question himself. For Smith submits that Mr. Brown's narrative and/or answer to that question would move the needle more profoundly on the question of enhancements rather than the government simply declaring to Brown that "you conspired with Smith" and Brown putting up no verbal fight.

12

For all intents of purposes Mr. Jarmori Brown and the United States Government signed off on a plea agreement where Brown was "promised" that the government would argue for 27 months at sentencing. *Dkt entry # 73*. It would serve Mr. Brown no purpose to "disagree" with whatever they alleged at his Rule 11 hearing – if he wanted their promises to become a reality – which by seeing his wet signature on his plea agreement provides the only reasonable inference that he did so want.

### *Mr. Jahquel Pringle*

On February 20, 2024, came Mr. Pringle's turn. For the sake of brevity, nothing new is brought to light when compared to Mr. Brown's Rule 11 hearing. The same recitation of facts was given by the government with this Court now asking Pringle if he disagreed with any of it. Pringle of course said "no". *See gov't exhibit 5* at page 8. Again, we would hope but can't state with any degree of certainty that Pringle gave any effort in listening to his alleged facts. For just like Brown, Pringle too already signed a plea agreement with an agreed-upon sentencing range which would be argued by the government. *Dkt entry # 140*. It must be without dispute that any "disagreement" by Pringle with the government's statement of facts would serve him no purpose after his wet signature also appeared on his respective plea agreement.

### *Smith never signed any similar plea agreement*

In reality, the government's submission of these Rule 11 transcripts as evidence to support an enhancement against Mr. Smith does beg a couple of questions. For starters, if the government gleaned substantial or other compelling evidence (over the course of the conspiracy) of Mr. Smith's agreement with Pringle and Brown to cart so many guns up north, do we think they would resort to introducing Rule 11 transcripts years later to prove that agreement? More specifically, would they give this a try where they know that both Pringle and Brown have their own agenda in agreeing with how the government has alleged this case? Unfortunately for them,

13

their approach has exposed the weaknesses that exist within the hard evidence supporting the enhancement against Mr. Kobe Smith.  Secondly, why is it that Smith not only by-passed on signing a plea agreement, but even more importantly, only admitted to the elements of the offense at his Rule 11 hearing – which we see not only excluded Pringle and Brown as his co-conspirators, but which also excluded the number of weapons he agreed to transport?  A quick review of the exact facts which Mr. Smith plead guilty to bears this out:

> "Between January 2, 2020 and May 27, 2021, the defendant Kobe Smith willfully entered into an agreement with Brandon MOORE to obtain more than one firearm from Alabama, where MOORE lived, and transport them to Massachusetts, where SMITH lived, for SMITH's use."

*See PSR* at page 27.[8]

These facts read into Mr. Smith's Rule 11 colloquy amount to the operative element 18 U.S.C. § 922 (a)(3).  Of course Smith could have easily signed a plea agreement with the government and thereafter admitted his way to a 24-30 month recommended GSR and with a governmental proposed 24 month sentence – just like they are arguing now.   That didn't happen.  The reason why Smith didn't sign any such plea agreement is because he contends he is INNOCENT of agreeing to traffic all of those guns up north.  In all fairness to the government, however, they never tried to force him to admit otherwise.  But now we are here at sentencing and with:  1) NO witnesses being presented; 2) NO statements coming from the mouth of Mr. Smith to demonstrate his intent to agree to the overall scope of the conspiracy; and with 3) NO actions of his being discussed to evince the same.  Instead, we are reading Rule 11 colloquies with a narrative created by the government where the allegation of the conspiracy is given in conclusory fashion and where other defendants simply acquiesce.  We don't even have some sort

---

[8] Smith does not have a transcript of the Rule 11 hearing but is highly certain (based upon the agreement between the parties) that the quote above was the language read into the record.

of developed and/or detailed sworn statement coming from either Pringle or Brown that was **"internally and externally consistent"**, so that we could attach an indicia of reliability which satisfies due process.

As such the Defendant asks this Court to reject the government's last-minute showing of their proof outright, opining that to rely upon it to enhance a defendant's sentence would offend fundamental notions of due process. For the government to now and try and handcuff Mr. Smith to the separate admissions given by Brown and Pringle seems as an unfair end-around to enhancing Smith. Lastly the cases provided by the government to support their cause appear inapposite.[9]

### APPLICATION OF 18 U.S.C. §3553 – THE NEED FOR THE COURT'S SENTENCE TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, PROVIDE JUST PUNISHMENT, AFFORD ADEQUATE DETERRENCE AND PREOTECT THE PUBLIC

The undersigned concedes and respects the fact this Court has applied the statutory sentencing regime in more cases than anyone would desire to count, and also recognizes that these factors are all a mechanism of perspective. With that in mind Smith appreciates that the Court has its' own working barometer with how these factors translate to a just sentence. Meaning, Mr. Smith surmises that the Court already knows (from its vast experience on the bench) what length of a sentence will address: a) respecting the law; b) individualized and general deterrence; as well as c) community safety. He doesn't believe that his subjective viewpoint on the matter would carry much weight against that vast experience.

---

[9] In the government's addendum, they cited to *United States v. Grigsby*, 692 F. 3d 778 (7th Cir 2012) (plea agreement of two co-conspirators along with sworn grand jury testimony sufficient to support obstruction of justice enhancement); *United States v. Maximiliano Figaro-Benjamin*, No. 21-1749 (1st Cir. April 30, 2024) (co conspirator testimony at co-defendants' trial admissible against 3rd co-defendant at sentencing). Mr. Smith was not present for either sentencing hearing, but he counters that both cases appears to have the "rich details" needed for proper conclusions of reliability. *See e.g., United States v. Moncivais* 402 F. 3d 652, 659 (6th Cir. 2007). Furthermore, both cases involved some sort of sworn "testimony" with *Figaro-Benjamin* obviously being subject to cross examination.

However, and if Mr. Smith were to add anything to the analysis, he merely asks the Court to start with the minimum sentence permissible and add only so much additional punishment, if any, as is necessary to comply with Section 3553(a)'s purposes. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  As a result, and if this Court agrees with probation's GSR calculation, and also believes that a sentence within that range would be appropriate, a time-served sentence would not add only additional and unnecessary punishment, but frankly with no one to blame but an attempt at zealous advocacy by his counsel.[10]

The last thing that Mr. Smith would add, and which is already overtly seen in his PSR was his mature attitude towards life – offense conduct notwithstanding.  Before he went into custody (at the age of 22 years old), Mr. Smith has had a stable relationship with the mother of his child since 2018.  *PSR* at ¶49.  They share a now 2 year old son, and when Mr. Smith went into custody, his nuclear family moved back to Boston (from Oregon) to be with him in spirit. *Id.*  The mother of his child has described Mr. Smith as "very honest, family oriented, and a hard worker). *Id.* at ¶50.  He had a strong employment record (*id.*, at ¶¶56-62) and has managed to keep a structured lifestyle, in spite of what has been described as having a "tough life". *Id.* at ¶50.

This tough life involved Mr. Smith growing up as a ward of foster care and since the age of seven years old. *Id.* at ¶46.  He was also separated from his siblings during his undesired bout with foster homes. *Id.*  We can probably attribute Mr. Smith not falling off of the proverbial developmental cliff were it not for his adoption by his cousin (T. Smith) which actually brought

---

[10] As an admission, the undersigned unsuccessfully filed a Motion to Dismiss, and thereafter filed a Motion *in limine* to exclude uncharged conduct – which was rendered "moot" after Mr. Smith elected to plea guilty. *Dkt. entry* #150. The amount of time generated to advance those pleadings could have been redirected towards the instant sentencing argument submitted earlier in time.  Depending on how this Court sets its' advisory guideline range and ultimate sentence, it very well could have allowed Mr. Smith to be at liberty much earlier than whenever he is ultimately released.  This wasn't a miscalculation but rather just the nature of criminal litigation – for if this Court allowed Smith's Motion to Dismiss, he would have experienced relief along that vein.  This point is only mentioned now simply for perspective on affording any possible equities to Mr. Smith.

all of his siblings back into a family fold. *Id.* at ¶¶46-48. Mr. Smith prospered in sports (*id.,* at ¶50), and from the outside looking in appeared to be striving, all things considered. It also appears that Mr. Smith has developed the necessary tools *before* going into custody to continue on a positive trajectory *after* he is released.

## CONCLUSION

Mr. Smith comes before you as a man who has never spent a day in jail (for a previous conviction) and with no other criminal convictions save the instant one. His crime is not necessarily one of violence, nor has he ever been reported to have violent proclivities. He can be released back into the community with a sure confidence that the community will not be in peril. Yes, he did misstep with trying to purchase a gun out of state, but on the flip side, he could have legally done so in a different way under federal law. His crime is doing so via the black market. He may have also had an element of protection on his mind, but still he must concede that to possess a weapon in any context could mean that someone could have gotten hurt. The lesson learned here for Mr. Smith? Stay on the structured path you were building for yourself in spite of all of your challenges - which also includes obeying the law. It is not a demanding ask, and Mr. Smith has the tools to do it. As such, 17 months (out of five year maximum) is sufficient as a sentence for his crime.

    Respectfully Submitted**,**
    KOBE SMITH
    By his Attorney,

    **/s/ Gordon W. Spencer**
    Gordon W. Spencer, Esq.
    BBO #630488
    166 Valley Street, Bldg 6M
    Providence, RI 02909
    (401) 922-0167

July 8th, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing upon all counsel of record this 8th day of July, 2024 via electronic transmission, and US Probation.

               /s/Gordon W. Spencer
               Gordon W. Spencer